[No. 26954-2-I.    Division One.    August 8, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT W. STROHM, *Appellant*.

302

*Robert H. Gombiner* of *Federal Public Defender,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for respondent.

WEBSTER, C.J. — Robert W. Strohm appeals his convictions of leading organized crime, first degree trafficking in stolen property, and first degree theft. He claims there was insufficient evidence to support conviction on all counts and the court erred in admitting expert testimony and in denying a continuance. We disagree.

## FACTS

Strohm was charged with 17 counts of leading organized crime, first degree trafficking in stolen property, and theft. He paid a group of self-confessed drug addicts to steal cars for his use in a "salvage-switch" operation. The salvage-switch scheme involves placing new stolen car parts on the frame of an old car, which then takes on the appearance of a newer car. The car retains its original "Vehicle Identification Number" (VIN) which shows it not to be stolen. The new-appearing car can then be sold for a much higher price than the old car. Erik Skarsvog, Billi Smith, Calvin Hammer, and Dennis McCrea testified extensively about cars they had stolen for Strohm. The majority of the thefts were accomplished using keys supplied by Strohm.

Strohm's codefendant Stanley Hunter entered a plea of guilty, and asserted his right to remain silent. Defense counsel conceded that Hunter was unavailable based on his Fifth Amendment privilege and the fact that he had not been sentenced. Counsel then moved to either dismiss the reference to Hunter in count 1 or continue the trial until after Hunter had been sentenced. The court denied the motion.

Detective Isom had keys made from key codes of eight stolen automobiles. Of the sets of keys made for stolen cars, five keys fit in four vehicles connected with Strohm. A district service engineer for Ford Motor Company testified that, since 1982, every Ford automobile used two separate keys, one for

the doors and one for the ignition, and that there were 1,129 different door key patterns, the same number for the ignition, and the patterns were assigned randomly, "[a]s best we can". An industrial psychologist with the Washington State Patrol, Dr. Douglas Cederblom, who had been trained in statistical analysis and uses it in the course of his work, testified as to the probabilities of keys matching these vehicles. He testified that if the keys are distributed randomly, the chance that two different keys will match a particular car is 1 in 1,129 $\times$ 1,129, or 1 in 1,274,641. The probability of all five keys made from key codes of stolen vehicles fitting is astronomical. Strohm objected that under "ER 702 and 3 and 4, [the testimony would not] help the jury understand the evidence any better". The court admitted the testimony; defense counsel choose not to cross-examine.

At the close of the State's case, the court dismissed four counts: two counts of trafficking (counts 4 and 7) and two counts of theft (counts 11 and 12). The jury found Strohm not guilty on another four counts: three counts of trafficking (counts 10, 6, and 3) and one count of theft (count 14). Strohm was convicted of leading organized crime (count 1), seven counts of trafficking in stolen property (counts 2, 5, 8, 9, 15, 16, and 17), and one count of theft (count 13). He received concurrent standard range sentences: 51 months on count 1; 43 months on the trafficking counts; and 20 months on count 13.

■■ Strohm claims there was insufficient evidence to support some of the alternative means of leading organized crime and all of the trafficking charges. "A claim of insufficiency admits the truth of the State's evidence and all inferences that can reasonably be drawn therefrom." *State v. Wilson*, 71 Wn. App. 880, 891, 863 P.2d 116 (1993).

> [W]here a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means.

*State v. Bland*, 71 Wn. App. 345, 353, 860 P.2d 1046 (1993) (quoting *State v. Kitchen*, 110 Wn.2d 403, 410-11, 756 P.2d

105 (1988) ("the court must determine whether a rational trier of fact *could* have found each means of committing the crime proved beyond a reasonable doubt")). "If one of the alternative means upon which a charge is based fails and there is only a general verdict, the verdict cannot stand *unless* the reviewing court can determine that the verdict was founded upon one of the methods with regard to which substantial evidence was introduced." *Bland*, at 354.

## Leading Organized Crime

Strohm claims there was no evidence that he supervised, organized, or financed the theft of property. Strohm does not discuss managing or directing; thus, he concedes that those alternative means are supported by the evidence.

(1) A person commits the offense of leading organized crime by:

(a) Intentionally organizing, managing, directing, supervising, or financing any three or more persons with the intent to engage in a pattern of criminal profiteering activity; or
. . ..

RCW 9A.82.060(1)(a). Trafficking in stolen property for financial gain constitutes criminal profiteering. RCW 9A.82.010(14)(o).

Here, the State charged Strohm with and the jury was instructed on every alternative means of committing the offense of leading organized crime. The jury returned a general verdict of guilty. Thus, for the verdict to stand there must be substantial evidence supporting each alternative means of leading organized crime.

Supervised. To "supervise" means "to coordinate, direct, and inspect continuously and at first hand the accomplishment of : oversee with the powers of direction and decision the implementation of one's own or another's intentions". *Webster's Third New International Dictionary* 2296 (1986).

Here, Strohm did far more than simply ask people to steal cars. He told them exactly which cars to steal, where to steal them, how to steal them, and what to do with them once they were stolen. He monitored the thieves' performance of their tasks. When they fell short, he disciplined them. When Billi Smith was arrested and convicted for stealing one of

the cars he disciplined her by not hiring her again. When Hammer failed to make prompt delivery of a stolen car, Strohm reprimanded him and withheld part of Hammer's payment. Supervise is a well-recognized term for the activity of a person in giving directions to employees, monitoring their performance, and imposing discipline for substandard performance: exactly what Strohm did here.

Financed. Here, a rational trier of fact could conclude that Strohm financed the thefts because he promised to pay and then paid for the delivered stolen cars. Each payment for a theft provided the thief assurance that he would be paid in the future for successful thefts. Strohm financed the thefts using his credit with the thieves. They would not have stolen the vehicles at his direction had they not been assured of payment. Since he provided the capital necessary for the thefts to take place Strohm financed the theft of property.

Organized. Organize means "to arrange or constitute into a coherent unity in which each part has a special function or relation," or "to unify into a coordinated functioning whole". *Webster's Third New International Dictionary* 1590 (1986). Here, Strohm decided what cars were to be stolen, he selected the thief, often obtained the keys to the car or directed the thief to break the lock box to obtain the keys, and designated the place for delivery. He verified delivery and made payment. In the theft of the Totem Lake Ford (count 9) Strohm changed his mind at the last minute about which car he wanted stolen. He arranged for the correct keys to be left on the tire of the car. Along with the keys, Strohm provided an ice scraper so that the enterprise would not be endangered by the need to wait while the windows were defrosting. Thus, Strohm organized the theft of vehicles and coordinated the thieves' actions with his own activity.

■ ■ Strohm also claims that the jury instructions improperly allowed the jury to convict under count 1 on the basis of the acts of criminal profiteering set out in counts 16 and 17. He argues that on those counts there was no evidence of who the thief or thieves were, thus, the jury had no basis to conclude that the thief was one or more of the

people named in the information (Smith, Hammer, Hunter, and McCrea). However, this argument fails to consider the instructions as a whole. *State v. Schulze*, 116 Wn.2d 154, 167, 804 P.2d 566 (1991). Instruction 9 specifically required that to convict of leading organized crime the jury had to be unanimous as to which three people were involved. Juries are presumed to follow instructions. *State v. Stith*, 71 Wn. App. 14, 22, 856 P.2d 415 (1993). Thus, absent a showing otherwise, although the jury could have considered counts 16 and 17 as part of "the pattern of criminal profiteering activity", it could not have found counts 16 and 17 a basis for conviction on count 1. The evidence shows that Strohm directed all four people named in the trafficking counts: Smith (8 and 9), Hammer (2), Hunter (5), and McCrea (15).

### Trafficking

Strohm claims there was insufficient evidence to support each count of trafficking on several of the alternative means charged. RCW 9A.82.050(2) provides that "Trafficking in stolen property" can be committed by eight alternative means.

> A person who knowingly [1] initiates, [2] organizes, [3] plans, [4] finances, [5] directs, [6] manages, or [7] supervises the theft of property for sale to others, or [8] who knowingly traffics in stolen property, is guilty of trafficking in stolen property in the first degree.

Trafficking is defined separately as:

> "Traffic" means to sell, transfer, distribute, dispense, *or* otherwise dispose of stolen property to another person, or to buy, receive, possess, or obtain control of stolen property, with intent to sell, transfer, distribute, dispense, or otherwise dispose of the property to another person.

(Italics ours.) RCW 9A.82.010(10). The court included the definition in its instructions.

Strohm seizes upon the "traffics" alternative, claiming that there was no evidence that he disposed of the Saleen Mustang (count 2), that while the evidence may support that he transferred or distributed parts from the Dodge to another, only conjecture supports a finding that he sold the parts (count 5), there was insufficient evidence that he ever

sold parts from or tried to sell parts from the flatbed truck (count 8), there was no evidence that he placed parts from the stolen vehicle on Kneeland's red Mustang[1] (count 15), and that since there was no evidence as to who stole the Mustangs from Southgate Ford the jury could not find he trafficked in the vehicles because the evidence does not support that he either initiated, organized, planned, financed, directed, managed, or supervised these thefts (counts 16 and 17). Thus, he argues that the evidence does not support all of the "traffics" alternative means of "Trafficking in stolen property" under RCW 9A.82.050 (2).[2]

■■ Strohm reads *Kitchen* and RCW 9A.82.050(2) too broadly. He is essentially arguing that RCW 9A.82.010(10) sets up additional alternative means or alternative "means within a means". Washington courts have rejected that approach to alternative means cases. In *State v. Garvin*, 28 Wn. App. 82, 621 P.2d 215 (1980), *review denied*, 95 Wn.2d 1017 (1981), this court held that "[s]econd degree extortion pursuant to RCW 9A.56.130 is extortion committed by means of a 'threat' which is defined by RCW 9A.04.110(25)(d) through (j) . . . By defining '[t]hreat' the legislature was not creating alternative elements to, but merely defining an element of, the crime." *Garvin*, at 85.[3]

---

[1]Strohm seems to be alleging that there is no evidence that he ever received, possessed, or controlled the stolen parts.

[2]The State argues that "[this] court should . . . assume that the jury agreed on an alternative that was supported by the evidence. If some of the alternatives are not supported, the court should assume that the jurors, as rational people . . . did not base their finding on those alternatives." This argument has no merit; it does not preserve the right to a unanimous jury. *State v. Kitchen, supra.*

[3]In an analogous case, the Washington Supreme Court rejected a similar "means within means" argument. Although the jury must be unanimous as to the alterative circumstances satisfying aggravated murder, it was not required to unanimously agree as to facts (alternative ways) satisfying each of the alternative circumstances. *In re Jefferies*, 110 Wn.2d 326, 339-40, 752 P.2d 1338, *cert. denied*, 488 U.S. 948 (1988); *State v. Peerson*, 62 Wn. App. 755, 770, 816 P.2d 43 (1991) (jurors had to unanimously find that the State had proved the "common scheme or plan" aggravating factor beyond a reasonable doubt; there was no requirement that the jurors unanimously agree on the facts supporting the existence of that circumstance), *review denied*, 118 Wn.2d 1012 (1992); *accord State v. Longworth*, 52 Wn. App. 453, 464-65, 761 P.2d 67 (1988), *review denied*, 112 Wn.2d 1006 (1989).

Strohm has cited no authority for the proposition that definitional statutes create additional alternative means. The definition of "traffic" in the definition section of the statute does not add to the criminal statute; its only purpose is to provide understanding. Thus, we conclude that definition statutes do not create additional alternative means, "means within means", of committing an offense. By defining "traffic" the Legislature was not creating additional alternative means, but merely defining the traffics alternative means of "Trafficking in stolen property" under RCW 9A.82.050(2). The various ways a person can "traffic" under RCW 9A.82.010(10) are merely factual circumstances which support the traffics alternative under RCW 9A.82.050(2). Thus, there is no requirement that the jurors agree on the facts supporting the "traffics" alternative means of committing the offense of "Trafficking in stolen property".

Since the jury returned a general verdict there must be substantial evidence that Strohm knowingly (1) initiated, (2) organized, (3) planned, (4) financed, (5) directed, (6) managed, (7) supervised the theft of property for sale to others, and (8) knowingly trafficked in stolen property. RCW 9A.82.050(2). Here, there was substantial evidence supporting the trafficking conviction. As previously discussed the evidence supporting the leading organized crime conviction supports a finding that Strohm knowingly initiated, organized, planned, financed, directed, managed and supervised the theft of property for sale to others. However, to support the conviction of trafficking in stolen property, there also must be sufficient evidence, on each count, that Strohm knowingly "trafficked" in stolen property.

Count 2. Hammer stole the Saleen Mustang for Strohm. Strohm pointed out the car to be stolen, provided the key to the car, designated where to deliver it, and paid $110 in advance and an additional $300 on delivery. Strohm does not deny that evidence supports a finding that he purchased, received, and possessed the stolen Saleen Mustang. Thus, Strohm trafficked in the stolen Saleen Mustang.

Count 5. The evidence established that Strohm took Hunter to look at the Dodge Caravan, gave Hunter the keys to the vehicle, and later Hunter stole it, delivered it to him, and was paid $300 for it. Strohm stated "he needed a fender off of it for a friend of his, for repairing his car." Strohm and a friend stripped the door and right front quarter panel from the van, loaded the parts into their van and left. From these facts. the jury could reasonably infer that Strohm transferred the stolen parts to the friend which is sufficient to support the trafficking alternative.

We find no merit in Strohm's claim there was a fatal variance between the charge and the proof produced at trial. When an information charges a specific piece of stolen property and the State proves something else there is a fatal variance in the proof. *State v. Rhinehart*, 92 Wn.2d 923, 928, 602 P.2d 1188 (1979). However, *Rhinehart* does not apply here. The charge was that Strohm "knowingly initiated . . . the theft of property for sale to others, to wit: a 1989 Dodge Caravan . . ., and knowingly trafficked in stolen property". The bill of particulars described this count as follows:

> The State will rely on testimony of Billi Smith and Eric Skarsvog regarding arrangements made by Strohm with Stanley Hunter to steal the Dodge Caravan from the dealership, that Strohm gave Hunter the keys for the vehicle that Smith and Skarsvog assisted Hunter in stealing the vehicle, that *Strohm personally stripped parts off the vehicle and paid Hunter for them,* and Hunter dumped the stripped vehicle.

(Italics ours.) This is exactly what the State proved at trial. Thus, there was no variance between the charge and the proof.

Finally, Strohm also claims he cannot be convicted of both theft and trafficking on the basis of the same stolen property. He argues that "one cannot be both the principal thief and the receiver of stolen goods . . . [because] a man who takes property does not at the same time give himself the property he has taken." (Citations omitted.) *State v. Hancock*, 44 Wn. App. 297, 301, 721 P.2d 1006 (1986). However, in a theft/trafficking case the thief transfers the stolen property to another. Thus, *Hancock* does not apply; a

person can be convicted of theft and of trafficking in the same property.

Count 8. Strohm admits that the evidence shows he had rebuilt his own truck using stolen parts from the flatbed truck he paid Billi Smith to steal. The existence of similar acts establishes a common plan or scheme, and the existence of such a plan is circumstantial evidence. *State v. York*, 50 Wn. App. 446, 455-57, 749 P.2d 683 (1987), *review denied*, 110 Wn.2d 1009 (1988). The evidence established that Strohm carried out his business in a systematic manner: by hiring people to steal cars, stripping parts off those cars, reassembling those parts onto other cars, and selling the resulting vehicles. Strohm's previous conduct in having vehicles stolen, using the parts to fix up other vehicles, and using that vehicle before eventually selling it supports an inference that he intended to sell the truck sometime in the future. This evidence supports a finding that Strohm trafficked in stolen property.

Count 15. Strohm claims there was no evidence that he placed parts from the stolen vehicle on Kneeland's Mustang. However, substantial evidence existed that Strohm directed and paid $550 for the theft and sold Kneeland's Mustang with the stolen parts on it. He purchased and transferred stolen property to another, which supports a finding of trafficking.

Counts 16 and 17. Strohm claims that since there was no evidence as to who stole the Mustangs from Southgate Ford the jury could not find he trafficked in the vehicles because the evidence does not support that he either initiated, organized, planned, financed, directed, managed or supervised these thefts. However, the evidence shows Strohm incorporated the parts from these stolen vehicles into two other vehicles that he then sold. Based on this evidence, and in view of the evidence of Strohm's having vehicles stolen and using their parts to fix up and sell other vehicles, the jury could reasonably infer Strohm trafficked in stolen property.

Here on every count for which Strohm was convicted, there was substantial evidence of each alternative means of committing "Trafficking in stolen property". The facts establish that Strohm intentionally initiated, organized, planned, financed, directed, managed, and supervised the theft of stolen property, and trafficked in stolen property.

We affirm the judgment and sentence.

The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. *See* RCW 2.06.040; CAR 14.

KENNEDY and BECKER, JJ., concur.

Reconsideration denied September 13, 1994.

Review denied at 126 Wn.2d 1002 (1995).