[No. 47227-5-I.  Division One.  December 24, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. SALAH AL-HAMDANI, *Appellant*.

---

*James E. Lobsenz* and *Neal Philip* (of *Carney, Badley, Smith & Spellman*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Keith P. Scully, Deputy*, for respondent.

Cox, J. — Salah Al-Hamdani appeals his conviction for second degree rape. He primarily argues that there was insufficient evidence to prove that the victim was incapable of consent by reason of the "alternative means" of "mental incapacity" at the time of the admitted sexual intercourse. We hold that "mental incapacity" and "physical helplessness" are not alternative means within the second degree rape statute. Rather, these terms provide an understanding of ways in which the victim is incapable of giving consent to sexual intercourse. They do not constitute alternative means of committing second degree rape. Accordingly, our review of the record shows that there was sufficient evidence to support the conviction. Because his other claims have no merit, we affirm.

Al-Hamdani met N.J. and her female friend at a club and followed them to N.J.'s house. N.J. was so drunk when she left the club that she was vomiting, falling, and falling asleep. Al-Hamdani left N.J.'s house at her friend's request, but returned later that evening and let himself into the house. Al-Hamdani testified that he and N.J. had consensual sexual intercourse.

N.J. testified differently. She stated that she awoke to find him lying on top of her. She also testified that she refused his request that she perform oral sex. She further testified that she was unaware that they had sexual intercourse until she was examined at the hospital the next day.

The State charged Al-Hamdani with first degree burglary and second degree rape. At the close of all evidence, Al-Hamdani moved to dismiss the charge of second degree rape. He claimed there was insufficient evidence to show that N.J. was incapable of consent by reason of mental incapacity. The court denied this motion. The jury convicted Al-Hamdani as charged.

Following conviction, he moved for a new trial. He again argued that there was insufficient evidence that N.J. was mentally incapacitated. The court denied this motion.

Al-Hamdani appeals only the conviction for second degree rape.

## Sufficiency of Evidence

■ A properly instructed jury found Al-Hamdani guilty of second degree rape under RCW 9A.44.050:

> (1) A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person:
>
> . . . .
>
> (b) When the victim is incapable of consent by reason of being *physically helpless* or *mentally incapacitated*.[1]

---

[1] (Emphasis added.)

RCW 9A.44.010, the definitional section, states that:

> (4) "Mental incapacity" is that condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause.

> (5) "Physically helpless" means a person who is unconscious or for any other reason is physically unable to communicate unwillingness to an act.

Al-Hamdani stipulated at trial that he and N.J. had sexual intercourse. Thus, the first part of the statute is not at issue.

Al-Hamdani argues that RCW 9A.44.050(1)(b) creates two alternative means of committing second degree rape, when the victim's inability to consent is based either on *mental incapacity* or on *physical helplessness*.[2] Presuming that physical helplessness and mental incapacity are alternative means, he further argues that the State made no election as to means, had the burden to present sufficient evidence to support each of the two alternative means, and

---

[2] RCW 9A.44.050(1) states more fully that:

A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person:

(a) By forcible compulsion;

(b) When the victim is incapable of consent by reason of being physically helpless or mentally incapacitated;

(c) When the victim is developmentally disabled and the perpetrator is a person who is not married to the victim and who has supervisory authority over the victim;

(d) When the perpetrator is a health care provider, the victim is a client or patient, and the sexual intercourse occurs during a treatment session, consultation, interview, or examination. It is an affirmative defense that the defendant must prove by a preponderance of the evidence that the client or patient consented to the sexual intercourse with the knowledge that the sexual intercourse was not for the purpose of treatment;

(e) When the victim is a resident of a facility for mentally disordered or chemically dependent persons and the perpetrator is a person who is not married to the victim and has supervisory authority over the victim; or

(f) When the victim is a frail elder or vulnerable adult and the perpetrator is a person who is not married to the victim and who has a significant relationship with the victim.

failed to meet its burden.[3]

The threshold question we must address is whether alternative means analysis, as discussed in *Ortega-Martinez*,[4] applies here. We hold that it does not.

The Washington Supreme Court has rejected the application of this doctrine to "means within means." In *In re Personal Restraint of Jeffries*,[5] our Supreme Court reviewed a personal restraint petition in a death penalty case. At trial, the jury had found by special verdict that two statutory aggravating circumstances had been proven.[6] They were:

(a) That the defendant committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime; or

(b) There was more than one victim and the murders were part of a common scheme or plan or the result of a single act of the defendant; . . .[7]

On collateral review, Jeffries argued that the jury must unanimously agree on the alternative ways he had satisfied each of the alternative aggravating circumstances. Specifically, he argued that the jury was required to agree unanimously that he had committed the murder either "to conceal the commission of a crime," or "to protect the identity of a person committing a crime," or "to conceal the identity of a person committing the crime." The court rejected this argument as creating "means within means."[8] It held that the trial court had properly instructed the jury,

[3] *State v. Ortega-Martinez*, 124 Wn.2d 702, 707-08, 881 P.2d 231 (1994) (Unanimity is required on an underlying means of committing a crime where insufficient evidence exists to support each of the alternative means presented to the jury. If the evidence is sufficient to support each of the alternative means submitted to the jury, unanimity as to the means by which the defendant committed the crime is unnecessary. If the evidence is insufficient to present a jury question as to whether the defendant committed the crime by any one of the means submitted to the jury, the conviction will not be affirmed.).

[4] *State v. Ortega-Martinez*, 124 Wn.2d 902, 881 P.2d 231 (1994).

[5] 110 Wn.2d 326, 752 P.2d 1338, *cert. denied*, 488 U.S. 948 (1988).

[6] *Jeffries*, 110 Wn.2d at 339.

[7] *Jeffries*, 110 Wn.2d at 338.

[8] *Jeffries*, 110 Wn.2d at 339-40.

stating that it must unanimously agree whether either of the two alternatives, subparts (a) and (b), were proved beyond a reasonable doubt. There was no requirement to further instruct the jury as to unanimity within either subpart.

Likewise, in *State v. Laico*[9] this court applied *Jeffries* in an appeal of a conviction for first degree assault. There, we held that the statutory definition of "great bodily harm" was merely definitional and did not create alternative means of committing the crime of assault in the first degree. To prove first degree assault, the State had to prove that the victim suffered great bodily harm. The term "great bodily harm" was defined in the definition section of the statute as " 'bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ[.]' "[10] Laico argued that this created three alternative means of committing first degree assault, and that the jury must unanimously agree on one method. This court disagreed, stating: "Merely because a definition statute states methods of committing a crime in the disjunctive does not mean that the definition creates alternative means of committing the crime."[11] We held that "the definition of 'great bodily harm' does not add elements to the first degree assault statute, but rather is intended to provide understanding."[12]

In *State v. Strohm*[13] this court again applied the principles of *Jeffries*. Strohm appealed his convictions for leading organized crime, first degree trafficking in stolen property, and first degree theft. We held that the definition of "traffic," one of eight alternative means of committing the crime of trafficking in stolen property, which was contained

---

[9] 97 Wn. App. 759, 987 P.2d 638 (1999).

[10] *Laico*, 97 Wn. App. at 762.

[11] *Laico*, 97 Wn. App. at 762.

[12] *Laico*, 97 Wn. App. at 764.

[13] 75 Wn. App. 301, 879 P.2d 962 (1994), *review denied*, 126 Wn.2d 1002 (1995).

in the definitions section of the statute, did not create an additional layer of alternative means that would require jury unanimity.[14] We cited the *Jeffries* court as holding that "[a]lthough the jury must be unanimous as to the alternative circumstances satisfying aggravated murder, it was not required to unanimously agree as to facts (alternative ways) satisfying each of the alternative circumstances."[15] We concluded that:

> The various ways a person can "traffic" under RCW 9A.82.010(10) are merely factual circumstances which support the traffics alternative under RCW 9A.82.050(2). Thus, there is no requirement that the jurors agree on the facts supporting the "traffics" alternative means of committing the offense of "Trafficking in stolen property".[16]

Our court also stated in *Strohm*, however, that the State was required to prove each alternative means of the other charge against Strohm.[17] The statute governing that charge stated in relevant part that:

> (1) A person commits the offense of leading organized crime by:
>
> (a) Intentionally organizing, managing, directing, supervising, or financing any three or more persons with the intent to engage in a pattern of criminal profiteering activity; or . . . .

RCW 9A.82.060. Noting that the jury was instructed on every alternative means of committing the offense of leading organized crime, we held that there must be substantial evidence supporting each alternative means of leading organized crime.[18]

Here, unlike *Strohm*, the court did not instruct the jury that the terms "physically helpless" and "mentally incapaci-

---

[14] *Strohm*, 75 Wn. App. at 309.

[15] *Strohm*, 75 Wn. App. at 308 n.3.

[16] *Strohm*, 75 Wn. App. at 309.

[17] *Strohm*, 75 Wn. App. at 305.

[18] *Strohm*, 75 Wn. App. at 305.

tated" represented alternative means of committing second degree rape. Jury instruction number 11 stated:

> A person commits the crime of rape in the second degree when that person engages in sexual intercourse with another person when the victim is incapable of consent by reason of being physically helpless or mentally incapacitated.

This instruction, like the jury instructions in *Jeffries*, is correct. It does not necessitate application of the alternative means analysis, and does not require sufficient evidence under both the physical helplessness and mental incapacity circumstances.

Al-Hamdani relies heavily on *State v. Ortega-Martinez*. There, the court applied the alternative means analysis to the second degree rape statute. The court held that sufficient evidence supported each of the two alternative means of committing second degree rape that were considered by the jury: engaging in sexual intercourse by forcible compulsion or with someone incapable of consent by reason of mental incapacity.[19] Unlike the situation here, the two alternative means were contained in different subparts, RCW 9A.44.050(1)(a) and RCW 9A.44.050(1)(b). The two subparts clearly create alternative means. RCW 9A.44-.010(6) defines "forcible compulsion" thus:

> "Forcible compulsion" means physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped.

There is no requirement under RCW 9A.44.050(1)(b) that the State show any force or threat was used to compel the victim. A victim could even express consent, if there is sufficient evidence that the victim was incapable of effective consent. Thus, the provisions of the statute to which the *Ortega-Martinez* court applied the alternative means analysis are not analogous to the provisions at issue in this case.

---

[19] *Ortega-Martinez*, 124 Wn.2d at 708-09.

We now address the claim as to lack of sufficient evidence to support the mental incapacity circumstance. There is no challenge to the physical helplessness circumstance: a jury could have reasonably found that the victim was unconscious during a portion of the acts in question.

"The evidence is sufficient if 'after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt.' "[20]

As noted, Al-Hamdani does not argue that there was insufficient evidence that N.J. was unconscious during sexual intercourse. Rather, he argues that N.J.'s testimony that she woke to find him on top of her, told him "no" and "don't do that" when he asked her to engage in oral sex shows that she was not mentally incapacitated. He argues that because she was "an adult and a mother," she was aware of the nature and consequences of the act of sexual intercourse and could not be mentally incapacitated. Al-Hamdani also points to the testimony of Dr. Lawrence Halpern, who stated that excessive consumption of alcohol produces antrograde amnesia, or short term memory loss. Al-Hamdani argues that Halpern's testimony shows that N.J. could have been conscious and consented to sexual intercourse but have no memory of it when she awoke.

Al-Hamdani's argument that N.J. was necessarily capable of understanding the nature and consequences of sexual intercourse was essentially rejected in *Ortega-Martinez*:

> It is important to distinguish between a person's general ability to understand the nature and consequences of sexual intercourse and that person's ability to understand the nature and consequences at a given time and in a given situation. This treatment of the two as identical contradicts the express language of the statute. RCW 9A.44.010(4) specifically notes " '[m]ental incapacity' is that condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse . . . ."

---

[20] *Ortega-Martinez*, 124 Wn.2d at 708 (quoting *State v. Rempel*, 114 Wn.2d 77, 82, 785 P.2d 1134 (1990)).

... *See also State v. McDowell*, 427 So. 2d 1346 (La. Ct. App. 1983) (notwithstanding that victim, as a married woman and mother of children, obviously experienced intercourse and knew what it meant, the victim was incapable of understanding the nature of the act on the day of the act).[21]

Viewed in a light most favorable to the State, there is sufficient evidence in the record from which the jury could conclude that N.J. was so intoxicated that she was unable to understand the nature or consequences of sexual intercourse at the time it occurred. N.J. testified that, earlier in the evening, Al-Hamdani had placed her in his car and that she was only aware that staying there was a bad idea because her friend told her so. She also testified that when she woke to find Al-Hamdani on top of her "the whole thing was dream-like to me."

N.J. testified that she had at least 10 drinks during the evening and possibly more. Halpern and another expert, Patrick Friel, respectively testified that her blood alcohol level at the estimated time of the sexual intercourse was .1375 and .21. Halpern testified that a person with a blood alcohol level of .15 could not appreciate the consequences of his or her actions. N.J. testified that normally, if having sex with a man for the first time, she would do so in her bedroom, where she kept condoms, rather than in the living room without condoms. N.J. and her friend testified that N.J. was stumbling, vomiting and passing in and out of consciousness after she left the club. All of this testimony supports the determination that she was debilitatingly intoxicated at the time of sexual intercourse.

The court in *Ortega-Martinez* stated that:

> [a] finding that a person is mentally incapacitated for the purposes of RCW 9A.44.010(4) is appropriate where the jury finds the victim had a condition which prevented him or her from meaningfully understanding the nature or consequences of sexual intercourse.[22]

---

[21] *Ortega-Martinez*, 124 Wn.2d at 716.

[22] *Ortega-Martinez*, 124 Wn.2d at 711 (emphasis omitted).

The jury could have reasonably found from the evidence that, despite N.J.'s previous experience and her testimony that she refused to engage in oral sex, she was incapable of meaningfully understanding the nature or consequences of sexual intercourse at the time it occurred.

## Due Process

Al-Hamdani next argues that the State violated his due process rights by telling the jury in closing argument that unconsciousness is not mental incapacity, then arguing the opposite to the judge after the verdict. We hold there was no violation of due process here.

During closing argument, in reviewing the jury instructions for the jury, the prosecutor said:

> The sexual intercourse occurred when [N.J.] was incapable of consent. Incapable of consent. By two methods. One being physically helpless or two, mentally incapacitated. Now ladies and gentlemen, this is one prong. This is one element that the State has to prove to you. You could be six in this camp and six in this camp as long as the 12 of you agree that this element has been proven beyond a reasonable doubt.

> Let me state that again. Six of you could say that she's asleep when the sexual intercourse happened. Six of you could say that she was awake, but she was so intoxicated that she could not have consented. With the 12 of you united, that is proof beyond a reasonable doubt that this element has been proven.

> Now, I had mentioned what these definitions mean. Jury Instruction No. 16 talks about what mentally incapacitated is and what physically helpless means. Physically helpless, really easy. Someone is unconscious. Sleep qualifies. Someone doesn't have to be in an alcoholic coma as one of the experts testified to. They can merely be asleep. Someone asleep cannot consent to something. That's what physically helpless means.

> Now mentally incapacitated means something different. It means that someone is under the influence of a substance that causes them not to understand the nature and the consequences of the act of sexual intercourse. Again, influence of a substance that prevents a person from understanding the nature and the consequences of sexual intercourse.

We found nothing in the record to support the claim that the prosecution made inconsistent statements to the jury. We will not further address the argument to the extent it suggests there was such inconsistency.

At the hearing on the motion for a new trial following conviction, Al-Hamdani argued that unconsciousness could not be considered mental incapacity. The prosecutor responded by stating:

> I do not agree with counsel that unconsciousness can be discounted. In one of the factors of evaluating mental incapacity, nowhere does it say in the Legislative history or case law that unconsciousness cannot be taken into account with mental incapacity, and I would argue that it should be taken into account.
>
> Yes, it can be taken into account under both prongs in this case, physical helplessness as well as mental incapacity, but I think that it is a factor that is relevant in this trial and should go to both prongs.

Al-Hamdani claims this statement violated his right to Due Process. The Due Process Clause guarantees for every defendant the right to a trial that comports with basic tenets of fundamental fairness.[23] The prosecutor, as the agent of the people and the State, has the unique duty to ensure fundamentally fair trials by seeking not only to convict, but also to vindicate the truth and to administer justice.[24]

Al-Hamdani cites *Smith v. Groose*,[25] which held that the use by the prosecutor of inherently factually contradictory theories violated the principles of due process.[26] The court vacated Smith's conviction,[27] stating:

---

[23] *Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997) (en banc) (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 24-25, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981)), *vacated on other grounds*, 523 U.S. 538 (1998).

[24] *Thompson*, 120 F.3d at 1058.

[25] 205 F.3d 1045 (8th Cir.), *cert. denied*, 531 U.S. 985 (2000).

[26] *Smith*, 205 F.3d at 1052.

[27] *Smith*, 205 F.3d at 1053.

Smith's situation is unusual, and we doubt that claims such as his will often occur. To violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime. In the present case, the State's zeal to obtain multiple murder convictions on diametrically opposed testimony renders Smith's convictions infirm. "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."[28]

In *Thompson v. Calderon* the court held that where "[t]he prosecutor manipulated evidence and witnesses, argued inconsistent motives, and at [the other man accused of committing the murder's] trial essentially ridiculed the theory he had used to obtain a conviction and death sentence at Thompson's trial,"[29] there was a violation of Due Process.[30]

Citing these cases, the court in *United States v. Butner*[31] held that Butner's due process rights were violated where a prosecutor argued that Butner's testimony was not material when offered at another person's trial, then charged him with perjury regarding that testimony.[32] Perjury requires proof of materiality.[33]

In *State v. Roberts*,[34] the sole Washington case Al-Hamdani cited, the court held that the trial court incorrectly excluded a statement made to the police by the other

---

[28] *Smith*, 205 F.3d at 1052 (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)).

[29] 120 F.3d 1045, 1057 (9th Cir. 1997).

[30] *Thompson*, 120 F.3d at 1059.

[31] 2000 U.S. Dist. LEXIS 18005, 2000 WL 1842410 (W.D. Mo. 2000).

[32] *Butner*, 2000 U.S. Dist. LEXIS 18005, at *24, 2000 WL 1842410, at *17.

[33] *Butner*, 2000 U.S. Dist. LEXIS 18005, at *34, 2000 WL 1842410, at *13.

[34] 142 Wn.2d 471, 14 P.3d 713 (2000).

man accused of participating in the murder for which Roberts stood trial.[35] The court cited to *Smith* in noting that "the State itself has been perhaps the strongest proponent of the reliability of [the other man's] statement to the police" and that the State had introduced the statement at the other man's trial.[36]

Nothing in any of these cases supports the conclusion that the prosecutor violated Due Process by the statements in this case. In *Roberts*, *Smith* and *Thompson*, the defendants were convicted of murder and sentenced to death or to life imprisonment. In all four cases the prosecutor argued contradictory theories of fact or law as the very basis of the prosecutor's case.

In this case the prosecutor's argument to the jury was consistent with the law.[37] There is nothing in the record to suggest the prosecution argued inconsistently to the jury. The later quoted argument to the court following conviction, out of the presence of the jury, inexplicably asserts that unconsciousness could be taken into account with mental incapacity.[38] The inconsistency here does not in-

---

[35] *Roberts*, 142 Wn.2d at 499.

[36] *Roberts*, 142 Wn.2d at 498.

[37] Al-Hamdani argues that the court erred in deciding, at the hearing on the motion for a new trial, that unconsciousness can be considered mental incapacity as well as physical helplessness. In light of our holding that mental incapacity and physical helplessness are not alternative means, we need not reach that argument. In this context, we agree that the prosecutor's argument to the jury that unconsciousness is evidence of physical helplessness and not of mental incapacity is a correct statement of the law.

[38] That inexplicable assertion appears to be at odds with the express language of the definitions of mental incapacity and physical helplessness. The latter definition specially includes the word unconscious. The former does not. "Mental incapacity" is defined as a "condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause." RCW 9A.44.010(4). "Physically helpless" is defined as "a person who is *unconscious* or for any other reason is physically unable to communicate unwillingness to an act." RCW 9A.44.010(5) (emphasis added). But we need not further address the point here, there being no egregious conduct of the type in the cited cases sufficient to warrant the admittedly rare sanction employed in those cases.

volve the kind of egregious conduct found in the other cases. Thus, the remedy sought is simply not warranted.

We affirm the judgment and sentence.

BAKER and KENNEDY, JJ., concur.

Reconsideration denied May 7, 2002.