FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

2014 MAR 10 AM 9: 44



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 69308-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH ANTHONY DIGERLAMO | ) | |
| a/k/a JOSEPH DI'GEROLAMO, | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: March 10, 2014 |
| | ) | |

LAU, J. — Joseph Digerolamo appeals his conviction of rape in the second degree, challenging the sufficiency of the evidence.[1] He raises additional claims of error in a pro se statement of additional grounds. We affirm.

## FACTS

The evidence presented at trial established the following facts. In May 2009, 29-year-old SB traveled to the Seattle area from her home in Victoria, British Columbia with her 6-year-old daughter. The purpose of SB's trip was to visit relatives and

---

[1] The record contains several different spellings of the appellant's name. We use the spelling "Digerolamo" adopted by both parties in the briefing.

celebrate her grandmother's 83rd birthday. SB and her daughter stayed with SB's aunt, Glennis Johnny, and her aunt's husband, Joseph Digerolamo.

The day after SB arrived from Canada, there was a party at her aunt's house. Around 8 p.m., after most of the guests left the party, SB, her aunt, and a few other adult friends and relatives stayed up drinking whisky. According to SB, she did not usually drink, and "nursed" the first drink for a long time. Report of Proceedings (7/30/2012) (RP) at 299. Digerolamo, who was not drinking, made several "teasing" remarks to SB, telling her to "quit being a sissy drinker and to drink up." RP at 300. SB could not say how many drinks she had. SB was visibly intoxicated and remembered "pretty much nothing" after her aunt brought out a second bottle. RP at 304. When the party broke up and everyone went to bed, there were only four people left in the house—SB, her daughter, her aunt, and Digerolamo.

SB remembered climbing in bed with her daughter and, sometime later, rushing to the bathroom and vomiting repeatedly in the sink. While she was still in the bathroom sitting on the lid of the toilet seat, Digerolamo came in and asked if she was okay. The next thing she remembered was waking up in the dark and feeling a tongue inside her vagina. She moved her hand to push the person's head away, and then passed out again.

When she woke up in the morning, SB cried when she realized what had happened during the night. SB's aunt came in and after talking to SB, left the room and asked Digerolamo, "What did you do?" RP at 309. He denied doing anything. When SB's aunt went into the kitchen, she noticed a broken bottle of vodka on the counter that

had not been there the night before and an open window with the screen pushed out. Digerolamo called 911.

Digerolamo greeted the police officer who responded to the call and told her he believed the house had been burglarized. He showed the officer the broken bottle, then directed her to the open window, stating that it was the likely point of entry. The officer noted that the window screen was intact, and Digerolamo admitted he had replaced the screen. The officer asked whether anything was missing, Digerolamo said he did not know but reported that his niece had been assaulted.

After talking to SB, another officer took her to a hospital where a nurse performed a sexual assault examination and rape kit. Digerolamo's DNA (deoxyribonucleic acid) matched the profile taken from SB's vagina and underwear.

The State charged Digerolamo with rape in the second degree. Following a trial, the jury convicted him as charged. Digerolamo appeals.

## ANALYSIS

### Sufficiency of the Evidence

Digerolamo challenges the sufficiency of the evidence supporting his rape conviction.

A challenge to the sufficiency of the evidence admits the truth of the State's evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We view all evidence in the light most favorable to the State to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Joy, 121 Wn.2d 333, 338, 851 P.2d 654 (1993). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most

strongly against the defendant." Salinas, 119 Wn.2d at 201. We defer to the trier of fact to resolve conflicting testimony, evaluate the credibility of witnesses, and generally weigh the persuasiveness of the evidence. State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992). Circumstantial and direct evidence are accorded equal weight. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

Digerolamo was charged with violating RCW 9A.44.050(1)(b) which provides that a person is guilty of rape in the second degree "when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person [w]hen the victim is incapable of consent by reason of being physically helpless or mentally incapacitated." "Physically helpless" is defined as a person who "is unconscious or for any other reason is physically unable to communicate unwillingness to an act." RCW 9A.44.010(5). Mentally incapacitated refers to a "condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause." RCW 9A.44.010(4). The State must prove each essential element of the crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Oster, 147 Wn.2d 141, 146, 52 P.3d 26 (2002).

Mental incapacity and physical helplessness are not alternative means; they describe the ways in which a victim may be incapable of giving consent. State v. Al-Hamdani, 109 Wn. App. 599, 607, 36 P.3d 1103 (2001). The State is not required to make an election or present sufficient evidence of both circumstances. Al-Hamdani, 109 Wn. App. at 607.

Digerolamo claims the evidence does not support the finding that SB was incapable of consent because of either physical helplessness or mental incapacity. He claims the evidence did not show that SB was severely intoxicated and, therefore, mentally incapacitated like the victim in Al-Hamdani. There, the victim estimated she had consumed at least 10 alcoholic drinks and, according to expert testimony, her estimated blood alcohol level was between .1375 and .21 at the time of the sexual assault. Al-Hamdani, 109 Wn. App. at 609. In addition, a witness described the victim's conduct prior to the assault as "stumbling, vomiting, and passing in and out of consciousness . . . ." Al-Hamdani, 109 Wn. App. at 609.

While there was no specific evidence here about SB's blood alcohol level, and she was unable to estimate how many drinks she consumed, as in Al-Hamdani, there was evidence of visible intoxication. And like the victim in Al-Hamdani, evidence established that SB was experiencing severe symptoms of intoxication on the night of the assault, including dizziness, vomiting, and passing in and out of unconsciousness.

Citing State v. Bucknell, 144 Wn. App. 524, 183 P.3d 1078 (2008), Digerolamo contends that SB was not physically helpless because she was able to communicate her unwillingness to engage in sexual intercourse. In Bucknell, the State charged the defendant with rape in the second degree, alleging that the victim "was physically helpless because she was suffering from Lou Gehrig's disease." Bucknell, 144 Wn. App. at 528. This court reversed the conviction because the victim's "ability to communicate orally, despite her physical limitations, likely did not render her 'physically helpless' as contemplated by RCW 9A.44.050(1)(b)." Bucknell, 144 Wn. App. at 530. Although the victim was unable to move from the chest down, she was fully "able to talk,

answer questions, and understand and perceive information." Bucknell, 144 Wn. App. at 529-30.

In this case, Digerolamo points out that according to SB, she used her hand to try to push the head away. SB testified that when she woke up during the assault, she felt "frozen" and unable to move. RP at 308. She said:

> I remember laying there in the dark. And somebody's tongue (inaudible) around inside my vagina. I remember turning with my hands to try to get him off, but after that it's a complete blank. That's all I remember is just my hand just trying to get the head away, and that's all I remember until I woke up the next morning.

RP at 305. In contrast to the circumstances in Bucknell, the evidence in this case does not indicate that SB was incapacitated only with respect to her physical movement. SB's testimony amply supports the inference that during the assault, she was mostly unconscious and was unable to communicate, orally or otherwise.

Finally, Digerolamo argues that SB was not physically helpless or mentally incapacitated because she could describe the assault with a "great amount of detail." Br. of Appellant at 6. But to the contrary, SB primarily described being unconscious, interspersed with a few flashes of memory and minimal details. The jury could have reasonably concluded that SB was unable to appreciate the nature and consequences of sexual intercourse at the time it occurred. See State v. Ortega-Martinez, 124 Wn.2d 702, 716, 881 P.2d 231 (1994) ("It is important to distinguish between a person's general ability to understand the nature and consequences of sexual intercourse and that person's ability to understand the nature and consequences at a given time and in a given situation.").

Viewing the evidence and the inferences in the light most favorable to the State, sufficient evidence supports the conviction of rape in the second degree.

Statement of Additional Grounds

In a pro se statement of additional grounds, Digerolamo argues that when police officers responded to his call, they should have advised him of his rights under Miranda v. Arizona[2] before taking his recorded statement.

Police must provide Miranda warnings whenever a suspect is subjected to a custodial interrogation by a State agent. State v. Heritage, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). Such a warning is not required if the questioning is noncustodial and part of a routine, general investigation in which the defendant voluntarily cooperated but is not yet charged. State v. Short, 113 Wn.2d 35, 41, 775 P.2d 458 (1989). "Mere suspicion, before the facts are reasonably developed, is not enough to turn the questioning into a custodial interrogation." State v. Hilliard, 89 Wd.2d 430, 436, 573 P.2d 22 (1977).

The police did not subject Digerolamo to custodial interrogation when they came to his house at his behest and recorded his statement reporting alleged crimes. Digerolamo initiated the contact with the police and agreed to give a recorded statement. Nothing in the record indicates that when they spoke to Digerolamo on June 1, 2009, months before his eventual arrest, police officers had probable cause to arrest him. The court did not err in admitting Digerolamo's recorded statement.

Digerolamo also argues that police officers violated his constitutional rights when they obtained a DNA sample without probable cause or a warrant. But here again, the

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

record indicates that Digerolamo agreed to provide a DNA sample. RP (June 26, 2012) at 223. Consent to search is valid if (1) it is voluntary, (2) it is granted by a person having authority to consent, and (3) the search does not exceed the scope of the consent. State v. Reichenbach, 153 Wn.2d 126, 132, 101 P.3d 80 (2004). Digerolamo offers no reason as to why his consent is invalid.

Digerolamo claims the evidence was insufficient to establish that he committed the crime because SB did not specifically identify him. We disagree. Substantial evidence supports the jury's determination that Digerolamo was the person who assaulted SB, including DNA evidence, circumstantial evidence, and his own statements. He also argues that SB's testimony should have been discredited due to certain discrepancies and omissions. But his attorney challenged SB's credibility based on these issues. The persuasiveness, credibility, and weight of the evidence are matters for the trier of fact and are not subject to appellate review. See State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

In addition, Digerolamo alleges police misconduct and shoddy investigation. For instance, he claims that the officer who took the DNA sample mishandled the evidence because after collecting the cheek swab, he folded the plastic sleeve containing the Q-tip, but did not seal it with tape until he returned to the office. But the testimony Digerolamo cites does not establish that the DNA evidence was improperly handled, nor does he identify any resulting prejudice.

Digerolamo also claims that the DNA testing and crime scene investigation were inadequate. At trial, the defense claimed that the police quickly identified Digerolamo as the suspect and argued that, as a consequence, they failed to pursue any evidence

inconsistent with that theory. Accordingly, the jury was able to evaluate the State's case in light of Digerolamo's argument that the investigation was focused solely on finding evidence to implicate him. Perhaps more significantly, Digerolamo's arguments on appeal, premised on evidence additional testing might have uncovered, are entirely speculative and beyond the scope of the record on appellate review. See State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

Finally, Digerolamo discusses Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), at length, but he does not actually identify any exculpatory evidence withheld by the State. His claim is based on the fact that in addition to his DNA, the DNA testing revealed the presence of DNA from an unidentified donor. This DNA was presumed to be from a consensual sexual partner. SB admitted to recent sexual contact with a consensual partner, but refused to provide that person's identity. There is no evidence in the record suggesting that the State withheld the identity of the donor. Moreover, nothing in the record suggests that determination of the identity of the donor would have explained the presence of Digerolamo's DNA or otherwise established his innocence.

We affirm.

WE CONCUR:

Spearman, A.C.J.

Becker, J.

-9-