# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49396-9-II |
| Respondent, | |
| v. | |
| JOEL MICHAEL KREBS, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Joel M. Krebs appeals his conviction of second degree rape. Krebs argues that (1) the State failed to present sufficient evidence of the essential element that the victim was incapable of consent, (2) the prosecutor committed misconduct during her closing argument, (3) the State elicited improper opinion testimony, (4) the trial court violated his right to a fair trial and abused its discretion in its evidentiary rulings, (5) cumulative errors require reversal, (6) his trial counsel was ineffective for not requesting an exceptional downward sentence, (7) the sentencing court ordered improper conditions of community custody, and (8) the sentencing court erred by sealing the victim's sexual assault protective order. Krebs also asks this court to clarify whether the sentencing court ordered the Department of Corrections (DOC) suggested conditions of community custody. In his statement of additional grounds (SAG),[1] Krebs claims that insufficient evidence supports his conviction, the prosecutor committed misconduct during closing, the trial

---

[1] RAP 10.10.

court erred in its evidentiary rulings, and the sentencing court erred by imposing legal financial obligations (LFO's).

We hold that (1) the State presented sufficient evidence that the victim was incapable of consent, (2) the prosecutor did not commit misconduct during closing, (3) the State did not elicit improper opinion testimony, (4) the trial court did not violate Krebs' right to a fair trial or abuse its discretion in its evidentiary rulings, (5) because there is no error, the cumulative error doctrine does not apply, (6) Krebs did not receive ineffective assistance of counsel at sentencing, (7) the sentencing court ordered appropriate conditions of community custody, and (8) Krebs has waived his argument that the sentencing court erred by sealing the victim's sexual protective order. We also clarify that the sentencing court did not order the DOC suggested conditions of community custody. Also, because his first three SAG claims are the same as in his direct appeal, we hold that the claims fail for the same reasons. As to his fourth SAG claim, we hold that Krebs' claim fails because the LFO's ordered were mandatory. We affirm Krebs' conviction.

FACTS

I. BACKGROUND

On February 9, 2016, SC[2] posted on social media that she would be returning to her hometown, Montesano, that weekend. Krebs, SC's former boyfriend, and Tanner Birdsall, a friend, saw the post and arranged to meet SC that night. The three met at Birdsall's home. After a night of drinking, SC woke up with a foggy memory and a feeling that she had had sexual

---

[2] After review of the parties' briefs and the record in this matter, and in light of the existing sexual assault protective order entered under GR 15(c)(2) to protect the victim's identity, the court will identify the victim by her initials. We intend no respect.

intercourse the previous night. Eventually, she began to remember the night and remembered that the two men had sex with her. On March 8, Krebs was charged with second degree rape.

Prior to trial, defense counsel filed a motion in limine to exclude testimony that SC was drugged the night of the rape because there was no direct evidence that she had been drugged. The trial court denied the motion, holding that SC could testify as to how she felt and what she thought occurred that night. Also, prior to trial, the State filed a motion in limine to exclude evidence that would rebut SC's claim that she rarely drank alcohol. Defense counsel objected, and the trial court reserved ruling until it heard SC's testimony at trial.

## II. SC'S TESTIMONY

SC testified at trial. She described herself as someone who does not drink very much and testified that alcohol affects her more than the average person. SC testified that she is allergic to Vicodin and it makes her throw up, gives her migraines, and makes her violently ill. On February 9, she went to Birdsall's house and, once there, she drank alcoholic lemonade. Birdsall and Krebs were also drinking. The three began to play a drinking game called beer pong. At some point, the three decided to play "strip beer pong" wherein each time someone made a mistake in the game, that person would take off an article of clothing. Verbatim Report of Proceeding (VRP) (July 26, 2016) at 50. SC agreed to play but said she would not take off her underwear.

SC testified that Birdsall had recently broken his hand and the prosecutor asked if Birdsall had prescription medication. Defense counsel objected and the trial court sustained the objection. SC had three or four alcoholic lemonades at Birdsall's house. At some point, she began to feel fuzzy, and she fell down multiple times. SC went to the bathroom to sit down and began to feel dizzy. This was atypical from her past experiences drinking alcohol. She got up and began to fall,

3

but Krebs caught her. He then carried her to the bedroom because she could not stand. She remembers Krebs and Birdsall lying next to her on the bed and they began to kiss and touch her.

While in the bed she could not move and could barely speak. The men continued to touch her and then took off her underwear. She tried to say no and asked what the men were doing. While the men were touching parts of her body, SC testified that she was panicking but she could not stop them.

The next thing that SC remembers is Birdsall forcing his penis into her vagina. While Birdsall was doing this, Krebs put his penis in her mouth. SC wanted it to stop, but she was unable to move. SC remembers that Birdsall said he could not ejaculate because Krebs was in the room. SC believes, but is not sure, that Krebs left, and returned after Birdsall had ejaculated.

Krebs then forced his penis into SC's vagina. SC screamed and cried and asked him to stop; however, he did not relent. During this time, she stated that she was physically unable to move. After Krebs had ejaculated, SC passed out. She awoke nude and stumbled for her clothing, Birdsall asked if she needed anything. Because she was hyperventilating, she asked for her inhaler. She then passed out again and woke up with her clothes on. She did not remember any part of the assault until later on.

She left the house the next morning but did not remember anything that had happened. She asked the men if anything sexual had happened between them and the men denied any sexual activity. She asked if something sexual had happened because she had a sharp pain and a burning sensation inside and outside of her vagina. After she went to her mother's house, her memory of the previous night began to come back to her. Her mother took her to the hospital. SC then notified police that she suspected that she had been raped. The police told SC that she should do a

4

"confrontation call," whereby she would confront the men and the police would record the conversation. VRP (July 26, 2016) at 68.

On cross-examination, defense counsel asked if SC had previously given a statement that she knew everything that the men were doing to her. SC confirmed that she had done so. Defense counsel then read another of SC's statements where she had stated that while Birdsall was raping her, Krebs left the room. According to her previous statement, SC was unconscious and went in and out of consciousness for some time during the rape.

### III. SERGEANT WALLACE'S TESTIMONY

Sergeant Darrin Wallace testified at trial. Wallace detailed his years of experience investigating sexual abuse cases. Wallace assisted Deputy Jason Wecker in the investigation of this case. Deputy Wecker did not have much experience in sexual abuse cases and Wallace coached him through the investigation. Wallace explained that Wecker had informed him that SC had told Wecker that Krebs and Birdsall had raped her the previous night. She had described how she had blacked out and could not remember what had happened.

Sergeant Wallace then described confrontation calls in general and specifically described SC's confrontation calls with the men. While describing the calls, Wallace described what he was doing. He stated,

> [Sergeant Wallace]: And I would write [SC] notes during the call to kind of steer her in a direction of what questions to ask.
> [The State]: And why is that done? Is that to help them so there's not dead silence or . . .
> [Sergeant Wallace]: It's - maybe not to fill dead silence, but the victims are so nervous and so --

VRP (July 26, 2016) at 105.

Defense counsel objected to the use of the word "victim" and the trial court sustained the objection. VRP (July 26, 2016) at 105. While describing SC's and other alleged victims' emotional states during confrontation calls, Wallace described how nervous they can be and stated,

> [The State]: And what issues or difficulties were there in - in either prepping [SC] or setting up the equipment for this particular conference call or confrontation call?
>
> [Sergeant Wallace]: When you're doing those calls, people doing the calls are very nervous. Nervous by being there, they're nervous about what happened, they're nervous about acknowledging what happened to them, so sometimes they get stuck on talking to the perpetrator and kind of just - -
>
> [Defense Counsel]: Objection. Reference to "perpetrator."

VRP (July 26, 2016) at 105-06. The trial court did not sustain the objection but encouraged Wallace to use language other than the term "perpetrator." VRP (July 26, 2016) at 106. Wallace then described Krebs' multiple denials of any sexual activity during the confrontation call. When asked what stood out to him about SC's confrontation call with Krebs, Wallace said that "when she was confronting him during the calls there was long pauses between her confrontation and his response. Normal people that I've dealt with --." VRP (July 26, 2016) at 107. Defense counsel objected to the use of the word "normal" and the trial court sustained the objection. VRP (July 26, 2016) at 107-08.

## IV. OTHER TRIAL TESTIMONY

Deputy Wecker also testified at trial. While interviewing Krebs, Krebs admitted to Wecker that both he and Birdsall had sex with SC that night.

Lisa Curt, the sexual assault nurse examiner (SANE), who examined SC, also testified at trial. SC had told her that she had fallen at Birdsall's home and Krebs took her to a bedroom where she had passed out. SC then remembered coming in and out of consciousness. Later on, SC woke up crying and screaming telling Krebs to stop because it hurt. The following day, SC began to

remember bits of what had happened. All she could remember was that she had fallen but could not recall anything that occurred that would make the inside of her vagina hurt.

Krebs testified at trial. He said that SC got drunk at Birdsall's home and, while she was sitting in the bathroom, she threw up. His other testimony was largely consistent with SC's, but he denied that he assaulted SC and claimed that SC consented to having sex.

## V. CLOSING ARGUMENT AND SENTENCING

During closing argument, the prosecutor argued that SC had testified that she had been unconscious when Krebs put his penis inside of her; thus, consent necessarily had not happened when the sex began. The State also pointed out that anyone who was falling down, vomiting, and needing to be carried because they could not stand, was in no condition to consent to sex. The State focused on SC's lack of memory following the incident to demonstrate SC's inability to consent.

Defense counsel focused his closing argument on the amount of alcohol that Krebs and SC drank that night and he argued that they were young, drunk, and dumb. Defense counsel argued that SC could not have been physically unable to communicate and unwilling to act because she told them no, which, he argued, negated the consent element of the second degree rape charge.

In rebuttal, the State characterized defense counsel's argument as blaming SC. The State said that defense counsel was trying to distract the jury from the fact that SC was unconscious that night and there had to be consent when the sexual act started. The jury ultimately found Krebs guilty of second degree rape.

At the sentencing hearing, defense counsel stated that he was not asking for an exceptional downward sentence. He acknowledged the standard range and asked the sentencing court to

7

impose the low end of the standard range of six and a half years. Defense counsel focused his argument on the fact that Krebs was 18 when the crime occurred and he was still young. Defense counsel also objected to some of the community custody conditions that the State was seeking and that DOC had suggested. The sentencing court stated that it considered Krebs' youthfulness, but imposed a midrange sentence of seven and a half years. The sentencing court also imposed a restitution fee, a victim assessment fee, a criminal filing fee, and a DNA collection fee.

The sentencing court orally imposed all community custody conditions requested by the State, including those suggested by DOC. However, the sentencing court did not include those conditions in its written judgment and sentence. Lastly, at sentencing, both the State and defense counsel signed an order sealing SC's sexual assault protection order to protect SC's identity. The sentencing court ordered that the protection order be sealed. Appellant appeals.

## ANALYSIS

### I. INCAPABLE OF CONSENT

#### A. LEGAL PRINCIPLES

Krebs argues that the State failed to prove the essential element of second degree rape, that the victim was incapable of consent.[3] We disagree.

Evidence is sufficient to support a conviction if, when viewed in the light most favorable to the State, it permits any reasonable juror to find the essential elements of the crime beyond a reasonable doubt. *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015). A claim of insufficiency of evidence admits the truth of the State's evidence and all reasonable inferences that

---

[3] Krebs makes this same claim in his SAG. We hold that this claim fails for the same reasons detailed in this section.

a juror can draw from that evidence. *Condon*, 182 Wn.2d at 314. "All reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). Circumstantial and direct evidence are equally reliable. *State v. Ozuna*, 184 Wn.2d 238, 248, 359 P.3d 739 (2015). We defer "to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

The State charged Krebs with violating RCW 9A.44.050(1)(b) which provides that a person is guilty of second degree rape "when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person . . . [w]hen the victim is incapable of consent by reason of being physically helpless or mentally incapacitated." "Physically helpless" is defined as a person who "is unconscious or for any other reason is physically unable to communicate unwillingness to an act." RCW 9A.44.010(5). "Mentally incapacitated" refers to a "condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause." RCW 9A.44.010(4). "A finding that a person is mentally incapacitated for the purposes of RCW 9A.44.010(4) is appropriate where the jury finds the victim had a condition which prevented him or her from *meaningfully* understanding the nature or consequences of sexual intercourse." *State v. Ortega-Martinez,* 124 Wn.2d 702, 711, 881 P.2d 231 (1994). The State must prove each of the essential elements of the crime beyond a reasonable doubt. *State v. Oster,* 147 Wn.2d 141, 146, 52 P.3d 26 (2002).

9

Mental incapacity and physical helplessness are not alternative means; they describe the ways in which a victim may be incapable of giving consent. *See State v. Al-Hamdani,* 109 Wn. App. 599, 606-07, 36 P.3d 1103 (2001). The State is not required to make an election or prove sufficientcy of the evidence under both physical helplessness and mental incapacity. *Al-Hamdani,* 109 Wn. App. at 607.

B. CAPABILITY

Krebs argues that the evidence does not support the jury's finding that SC was incapable of consent because of either physical helplessness or mental incapacity. We disagree.

Krebs argues that the evidence did not show that SC was physically unable to communicate her unwillingness or that she did not understand the nature of the act; therefore, she was not mentally incapacitated like the victim in *Al-Hamdani.* In *Al-Hamdani*, the victim estimated that she had consumed at least 10 alcoholic drinks and, according to expert testimony, her estimated blood alcohol level was between .1375 and .21 at the time of the sexual assault. *Al-Hamdani,* 109 Wn. App. at 609. In addition, a witness described the victim's conduct prior to the assault as "stumbling, vomiting, and passing in and out of consciousness . . . ." *Al-Hamdani,* 109 Wn. App. at 609.

Here, while there was no evidence about SC's blood alcohol level, there was evidence of visible intoxication. Like the victim in *Al-Hamdani,* the evidence established that SC was experiencing severe symptoms of intoxication on the night of the assault, including dizziness, stumbling, vomiting, and passing in and out of unconsciousness. When viewed in the light most favorable to the State, a rational fact finder could find that sufficient evidence existed to prove beyond a reasonable doubt that SC was debilitated by intoxicants at the time of the sexual

intercourse and that she was incapable of meaningfully understanding the nature or consequences of sexual intercourse at the time it occurred because she was intoxicated. Thus, because she was debilitated by intoxicants, sufficient evidence supports the jury's finding that SC was unable to consent by virtue of her mental incapacity at the time. Thus, sufficient evidence supports each of the essential elements of the second degree rape conviction.

Krebs also argues that SC was not physically helpless because she was able to communicate her unwillingness to engage in sexual intercourse, citing *State v. Bucknell,* 144 Wn. App. 524, 183 P.3d 1078 (2008). In *Bucknell,* the State charged the defendant with second degree rape, alleging that the victim "was physically helpless because she was suffering from Lou Gehrig's disease." 144 Wn. App. at 528. Division One reversed the conviction because the victim's "ability to communicate orally, despite her physical limitations, likely did not render her 'physically helpless' as contemplated by RCW 9A.44.050(1)(b)." *Bucknell,* 144 Wn. App. at 530. Although the victim was unable to move from the chest down, she was fully "able to talk, answer questions and understand and perceive information." *Bucknell,* 144 Wn. App. at 529-30.

In contrast to the circumstances in *Bucknell,* here the evidence does not indicate that SC was incapacitated only with respect to her physical movement. It is true that SC told Krebs to stop, and that she cried and screamed throughout the assault; however, she had no memory of the night, passed out at least once, and was at times too intoxicated to communicate her unwillingness to engage in sexual intercourse. SC's testimony amply supports the inference that during the assault, she was in and out of consciousness and unable to effectively communicate. Because she was unable to effectively communicate her unwillingness to have sex, sufficient evidence supports the jury's finding that SC was unable to consent by virtue of her physical incapacity. Thus,

11

sufficient evidence supports the jury's finding that SC was incapable of consent because of either physical helplessness or mental incapacity.

Finally, Krebs also argues that the jury's finding that SC was physically helpless or mentally incapacitated is not supported by sufficient evidence because she could remember and she could describe the assault. On the contrary, SC primarily described being in and out of consciousness, interspersed with a few flashes of memory and minimal details. The jury could have reasonably concluded that SC was unable to appreciate the nature and consequences of the sexual intercourse at the time it occurred. *See Ortega-Martinez,* 124 Wn.2d at 716 ("It is important to distinguish between a person's *general* ability to understand the nature and consequences of sexual intercourse and that person's ability to understand the nature and consequences at a given time and in a given situation."). Viewing the evidence and the inferences in the light most favorable to the State, sufficient evidence supports the jury's finding that SC was incapable of consent because of either physical helplessness or mental incapacity, and we affirm the conviction. Therefore, for the reasons enumerated above, we hold that this argument fails.

## II. PROSECUTORIAL MISCONDUCT

### A. LEGAL PRINCIPLES

Krebs argues that reversal of his conviction is required because the prosecutor committed misconduct during closing argument.[4] Specifically, Krebs argues that the prosecutor committed misconduct by repeatedly misstating evidence and relying on it to prove guilt, and by denigrating defense counsel and implying that counsel was lying.

---

[4] Krebs makes this same claim in his SAG. We determine that that claim fails for the same reasons detailed in this section.

To establish prosecutorial misconduct, the defendant must prove that the prosecuting attorney's remarks were both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). In analyzing prejudice, courts do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). "The prosecutor has a duty not to use statements that are not supported by the record and that may tend to prejudice the defendant." *State v. Ray*, 116 Wn.2d 531, 550, 806 P.2d 1220 (1991). "[A] prosecutor has wide latitude to argue reasonable inferences from the evidence." *State v. Thorgerson*, 172 Wn.2d 438, 453, 258 P.3d 43 (2011).

Here, because Krebs did not object at trial, he is deemed to have waived any error, "unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at, 761 (quoting *Thorgerson*, 172 Wn.2d at 455).

B. MISSTATING EVIDENCE

Krebs argues that two portions of the State's closing argument constituted improper misstatements of the evidence. Krebs argues that the prosecutor's suggestion that SC testified that, during the incident, she was in and out of consciousness was improper. However, during cross-examination of SC, defense counsel specifically quoted a statement that SC had previously given where she had stated that she was "coming in and out a lot" during the incident. VRP (July 26,

13

2016) at 77. Further, the SANE nurse read from her interview with SC and specifically stated that SC remembered "coming to off and on . . . ." VRP (July 27, 2016) at 146. Thus, the State did not misstate the evidence when it argued that SC was in and out of consciousness during the incident because this argument was supported by testimony presented to the jury.

Krebs also argues that the prosecutor "repeatedly told the jury that [SC] had testified that she was unconscious when Krebs . . . started having sex with her" and that was improper. Br. of Appellant at 21-22. Although he does not cite to specific provisions in the record, it appears that this argument by the State occurred a total of four times during its closing and rebuttal argument. It is true that SC never specifically testified that she was unconscious at the moment that Krebs began to have sex with her. However, there was evidence that indicated that she was in fact unconscious when it occurred. The SANE nurse read from her interview with SC, and stated,

> She started drinking and had more than her usual. She remembers stumbling to the bathroom and her ex-boyfriend caught her and carried [her] to the bedroom and she passed out.
>
> The next - she remembers coming to off and on and her ex saying some things to her, but she couldn't exactly recall what they were. She just knew that he was talking . . . .
>
> Later on she woke up, crying and screaming and telling him to stop because it hurt. She woke up again really confused and noticed that she was naked and had the door shut . . . .
>
> All she remembers is falling a few times, but nothing that would make her hurt inside her vagina, deep inside.

VRP (July 27, 2016) at 146-47. Further, SC testified that the day after the incident, she spoke with Krebs and asked for clarification on what happened the night before because she had little memory of it. Specifically, she wanted assurances that nothing sexual had happened between them. She later testified that the day after the incident, when relaying information to her mother, she could

14

only remember "falling down, waking up, naked on the bed, alone. And at that point that's all I could really remember." VRP (July 26, 2016) at 63. It was not until noon of the day after the incident that SC's memory began to come back to her.

Although it is true that SC did not specifically testify to being unconscious at the moment Krebs assaulted her, this statement was supported by the evidence presented at trial. Thus, the prosecutor did not misstate the evidence because it was supported by the facts at trial. Therefore, we hold that this argument fails.

C. DENIGRATING DEFENSE COUNSEL

Krebs argues that the prosecutor's comments about defense counsel were an attempt to distract the jurors from the evidence and these comments suggested that defense counsel was dishonest which also constitutes misconduct. He argues that, because it is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity, reversal is required, citing *Thorgerson*. We disagree.

Krebs also argues that it was improper for the prosecutor in rebuttal to tell the jury that it was defense counsel's belief that it was "somehow the victim's fault" and to imply that defense counsel's argument was that "because you're young and drinking you can do whatever you want." Br. of Appellant at 22; VRP (July 27, 2016) at 215. However, as explained above, the prosecutor has a wide ability to respond to defense counsel's arguments. *Thorgerson*, 172 Wn.2d at 453. In Krebs' closing argument, his counsel stated, "I said at the beginning there's a reason it's against the law to drink and be under 21. And yeah, Joel drank, so did [SC]. And this is a unique situation where alcohol cuts both ways." VRP (July 27, 2016) at 204. Thus, in context the prosecutor was

responding to the argument that SC shared responsibility in the assault, and thus, the prosecutor's argument was not improper.[5]

Krebs also claims that the prosecutor's argument was improper when she accused defense counsel of blaming the victim for being assaulted and argued that defense counsel was "trying to direct" jurors away from the fact that SC was unconscious. Br. of Appellant at 22; VRP (July 27, 2016) at 215-16. In his closing, defense counsel responded by arguing that "[s]he was a willing participant," and "[i]s she telling the truth? Is she confused because she was so intoxicated? Is she being influenced by other people to do things? [. . .] None of this do we really know, right?" VRP (July 27, 2016) at 210, 214. Defense counsel was trying to get the jury to focus on other things besides the evidence that SC was unconscious. The prosecutor's argument was not improper because it responded to defense counsel's arguments. Therefore, we determine that this argument fails.

### III. IMPROPER OPINION TESTIMONY OF GUILT

A. LEGAL PRINCIPLES

Krebs next argues that reversal is required because Sergeant Wallace gave improper opinion testimony of Krebs' guilt. Krebs argues that improper opinion testimony was elicited

---

[5] Further, defense counsel arguably invited this argument, or clearly foresaw this argument, because he cautioned the jury from listening to the State when it made this exact argument:

> Okay. You know, the State is going to get up and say - well, I hate to use - to say - I won't say it. I will imply it. He's saying because she got drunk and ran around in her underwear that I think she deserved it. That's not what we're saying at all. That's not what we're saying at all.

VRP (July 27, 2016) at 210.

when Wallace testified (1) about his training and experience in "sex crimes," (2) that he "coached" less experienced officers how to handle sex crime cases, (3) that SC had told him that she was raped by Krebs and Birdsall, and (4) using the terms "victim," "perpetrator," and "normal." Br. of Appellant at 26-27.

No witness may testify, directly or indirectly, to the guilt of the defendant. *State v. Kirkman*, 159 Wn.2d 918, 937, 155 P.3d 125 (2007). Testimony that "does not directly comment on the defendant's guilt or veracity, helps the jury, and is based on inferences from the evidence, [] is not improper opinion testimony." *State v. Johnson,* 152 Wn. App. 924, 930-31, 219 P.3d 958 (2009). "Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury." *Kirkman,* 159 Wn.2d at 927. An error of constitutional magnitude is presumed prejudicial and "the State bears the burden of proving it was harmless beyond a reasonable doubt." *State v. Lynch*, 178 Wn.2d 487, 494, 309 P.3d 482 (2013).

However, a lay witness may testify to opinions or inferences that are based upon rational perceptions that help the jury understand the witness's testimony, and that are not based upon scientific or specialized knowledge. ER 701.

B. SERGEANT WALLACE'S TESTIMONY

None of Wallace's allegedly improper opinion testimony actually constitutes improper opinion testimony. Wallace's testimony about his training and experience, testimony about coaching newer officers, and testimony relaying what Deputy Wecker had told SC, were not opinions of Krebs' guilt, but were proper recitations of the facts. Wallace's testimony did not

directly or indirectly comment on Krebs' guilt. Thus, we hold that none of this testimony was opinion testimony or was improper.

As to Wallace's use of "victim" and "perpetrator" during his testimony, the context is important. Wallace testified on direct examination about "confrontation calls" between the victim and the accused when he used these words. Although Krebs argues that Wallace repeatedly referred to SC as a "victim," the record does not support this claim. Wallace, while talking about confrontation calls, spoke generally about victims and stated,

> [Sergeant Wallace]: And I would write [SC] notes during the call to kind of steer her in a direction of what questions to ask.
>
> [The State]: And why is that done? Is that to help them so there's not dead silence or.
>
> [Sergeant Wallace]: It's - maybe not to fill dead silence, but the victims are so nervous and so --

VRP (July 26, 2016) at 105. Krebs objected to the use of the word victim and the trial court sustained that objection. This is not an instance of a witness opining that SC was a victim and necessarily that Krebs was guilty; rather, Wallace was explaining the notes he writes during confrontation calls.

While describing the format of a confrontation call, Wallace described the individuals receiving the calls as perpetrators, and defense counsel objected. The trial court did not sustain the objection but encouraged Wallace to use different language. Again in the context of his testimony, Wallace was not referring to Krebs as the perpetrator, but was describing these types of calls. He stated,

18

> [The State]: And what issues or difficulties were there in - in either prepping [SC] or setting up the equipment for this particular conference call or confrontation call?
>
> [Sergeant Wallace]: When you're doing those calls, people doing the calls are very nervous. Nervous by being there, they're nervous about what happened, they're nervous about acknowledging what happened to them, so sometimes they get stuck on talking to the perpetrator and kind of just - -

VRP (July 26, 2016) at 105-06. From the context, it is clear that Wallace was not giving an opinion that Krebs was the perpetrator of a rape; rather, he was explaining why people on confrontation calls are nervous.

Lastly, Krebs argues that Wallace's use of the phrase "normal people" implied guilt. When describing the actual confrontation call and describing what stood out to him, Wallace said, "[a]nd when she was confronting him during the calls there was long pauses between her confrontation and his response. Normal people that I've dealt with --." VRP (July 26, 2016) at 107. Defense counsel objected and the trial court sustained the objection. Here, Wallace did give an opinion, describing what made this confrontation call unique. However, his use of the phrase "normal people" does not directly or indirectly comment that Krebs was guilty of anything. It is simply Wallace's explanation of what distinguished this call from others. Thus, we hold that none of this testimony constitutes improper opinion testimony.

## IV. EVIDENTIARY RULINGS

### A. LEGAL PRINCIPLES

Krebs argues that the trial court abused its discretion when it excluded evidence that SC drank much more often than she testified, and because the trial court erred, his constitutional right to present a defense was violated. We disagree.

We review a Sixth Amendment right to present a defense claim under a three-step test. First, the evidence that a defendant desires to introduce "'must be of at least minimal relevance.'" *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)). A defendant only has a right to present evidence that is relevant. *Jones*, 168 Wn.2d 720. Second, if the evidence is relevant, the burden shifts to the State to show that the relevant evidence "'is so prejudicial as to disrupt the fairness of the fact-finding process at trial.'" *Jones*, 168 Wn.2d at 720 (quoting *Darden*, 145 Wn.2d at 622). Third, "the State's interest in excluding prejudicial evidence must be balanced against the defendant's need for the information sought, and relevant information can be withheld only if the State's interest outweighs the defendant's need." *State v. Horn*, 3 Wn. App.2d 302, 310, 415 P.3d 1225, (2018). This court reviews the first prong for an abuse of discretion and the second and third prong de novo. *Horn*, 3 Wn. App. 2d at 310-11.

A trial court abuses its discretion when its decision is based on untenable grounds or untenable reasons. *State v. Turner*, 143 Wn.2d 715, 724, 23 P.3d 499 (2001). "A decision is based 'on untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)).

"Evidence offered to impeach is relevant only if (1) it tends to cast doubt on the credibility of the person being impeached, and (2) the credibility of the person being impeached is a fact of consequence to the action." *State v. Allen S.*, 98 Wn. App. 452, 459-60, 989 P.2d 1222 (1999). An erroneous evidentiary ruling that violates the defendant's constitutional rights is presumed prejudicial unless the State can show the error was harmless beyond a reasonable doubt. *State v.*

*Guloy,* 104 Wn.2d 412, 425, 705 P.2d 1182 (1985).  An error is harmless beyond a reasonable doubt if there is no reasonable doubt that the jury would have arrived at the same verdict if it was allowed to hear the excluded evidence.  *State v. Coristine*, 177 Wn.2d 370, 389, 300 P.3d 400 (2013).

B.  EVIDENCE OF SC'S TESTIMONY RELATED TO HER PRIOR ALCOHOL USE

Krebs claims that "[b]efore trial, the court granted the prosecution's request to exclude testimony from witnesses who would have rebutted [SC's] claims that she 'rarely' drank or got drunk."  Br. of Appellant at 31.  However, contrary to Krebs' claim, the trial court reserved ruling on this motion stating,

> Well, we will see what the witness testifies to.  So, I am not prepared today to rule that out automatically, depends on the subject of [SC's] testimony.  Just off-hand, the fact that somebody has drank before, she is certainly subject to cross examination, by then we get into the point about introducing, that would be evidence of a prior inconsistent behavior, which is about matters that aren't really at issue, so probably wouldn't be admitted on that basis, so -- that a person got drunk before . . . .
>
> So they would have to know evidence about how that rebuts rarely drinks.  So right now, I don't know how that would do that, other than other people have drunk with her on certain occasions.

VRP (July 25, 2016) at 5-6.  Defense counsel did not raise this issue again after SC testified.

During her direct examination, SC described herself as someone who does not drink very much and testified that alcohol affects her more than the average person.  SC testified that she is allergic to Vicodin and it makes her throw up, gives her migraines, and makes her violently ill.  On February 9, she went to Birdsall's house and, once there, she drank four alcoholic lemonade drinks.  At some point, she began to feel fuzzy, and she fell down multiple times.  SC went to the bathroom to sit down and began to feel dizzy.  This was atypical from her past experiences drinking

alcohol. She got up and began to fall, but Krebs caught her. He then carried her to the bedroom because she could not stand. She remembers Krebs and Birdsall lying next to her on the bed and they began to kiss and touch her. While in the bed, she could not move and could barely speak. During her cross-examination, defense counsel asked her specifically whether she had previously drank with these specific individuals.

Contrary to Krebs' claim, the trial court did not *exclude* evidence that SC drank much more often than she testified to drinking. Defense counsel was not precluded from cross-examining or introducing witnesses to impeach SC's testimony about her prior alcohol use. Therefore, because the trial court did not error, we hold that Krebs' right to present a defense was not implicated or violated, and thus, his argument fails.

B.  SC'S TESTIMONY ABOUT VICODIN

Krebs also argues that the trial court abused its discretion by admitting testimony by SC, over his objection, that she thought that she may have been drugged at the time of the rape.[6] The State argues that during her testimony, SC did not speculate or make any connection as to the possibility that she was drugged or imply that Krebs or Birdsall intentionally drugged her. We agree with the State and hold that the trial court properly admitted SC's testimony in this regard.

ER 402 prohibits admission of evidence that is irrelevant. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. ER 403 provides that "[a]lthough relevant, evidence may be excluded if its probative

---

[6] Krebs repeats this same claim in his SAG. Because the trial court did not error, we reject this claim in his SAG for the same reasons detailed in this section.

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Contrary to Krebs' claim, SC did not speculate during her testimony at trial about possibly being drugged that night with Vicodin or that she was intentionally drugged by Krebs or Birdsall.

SC's testimony was relevant because it tended to make the existence of a fact of consequence, that her mental state was affected that evening, more probable than it would have been without the admission of her testimony.[7] After ruling that the evidence in this regard was relevant, the trial court conducted the proper balancing under ER 403 prior to admitting the testimony. Thus, because the evidence was relevant, and the relevancy was not substantially outweighed by any prejudice, the trial court did not abuse its discretion in admitting SC's testimony in this regard. Because the trial court did not err, we hold that Krebs' argument fails.

## V. CUMULATIVE ERROR

Krebs argues that cumulative error requires reversal of his convictions. The cumulative error doctrine applies when a trial is affected by several errors that standing alone may not be

---

[7] SC's testimony in this regard was also relevant to the statements she gave during the confrontation calls with Krebs and Birdsall, and her statements to the SANE nurse that she had fallen and could not stand on her own or she could not move. SC stated that she "could not really talk," "tried to say no," "couldn't do anything," "felt . . . paralyzed," "could barely keep [her] eyes open," "went unconscious again," "was in and out a lot," "couldn't move," "couldn't stand," "passed out," "was coming to off and on," and that she later "woke up, crying and screaming and telling him to stop." VRP (July 26-27, 2016) at 51-53, 56, 77, 146.

Further, SC's testimony in this regard was relevant to the statements made by Krebs describing how drunk SC was; how he heard her hit the floor; how he had to pick her up off the floor and carry her to the bedroom; how she had vomited in the bathroom before she fell; how he took her to the bedroom; and how she was falling all over the place.

sufficient to justify reversal but, when combined may deny a defendant a fair trial. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). To determine whether cumulative error requires reversal of a defendant's conviction, this court must consider whether the totality of circumstances substantially prejudiced the defendant. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014). The cumulative error doctrine does not apply when there are no errors or where the errors are few and have little or no effect on the trial's outcome. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

Because no errors occurred at trial, the cumulative error doctrine does not apply. Thus, we hold that this claim fails.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. LEGAL PRINCIPLES

Krebs next argues that his counsel was ineffective at sentencing for not requesting an exceptional downward sentence based on the mitigating factor of youth under *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015). We disagree.

A claim of ineffective assistance of counsel presents a mixed question of fact and law that we review de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009); *Strickland v. Washington*, 466 U.S. 668, 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To prevail on a claim of ineffective assistance of counsel, Krebs must show that (1) his trial counsel's representation was deficient and (2) his trial counsel's deficient representation prejudiced him. *Strickland,* 466 U.S. at 687; *State v. Thomas,* 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987).

The first prong is met by a defendant showing that the performance falls "'below an objective standard of reasonableness.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011)

(quoting *Strickland,* 466 U.S. at 688). A defendant alleging ineffective assistance must overcome "a strong presumption that counsel's performance was reasonable." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "'When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient.'" *Grier*, 171 Wn.2d at 33 (quoting *Kyllo*, 166 Wn.2d at 862-63). The second prong is met if the defendant shows that there is a substantial likelihood that the misconduct affected the verdict. *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). A failure to make either showing terminates review of the claim. *Thomas*, 109 Wn.2d at 225-26.

B. EXCEPTIONAL DOWNWARD SENTENCE

O'Dell was over eighteen years old when he was convicted of second degree rape. *O'Dell*, 183 Wn.2d 683. At sentencing, defense counsel asked the sentencing court to impose an exceptional downward sentence below the standard range because his youthfulness impaired his ability to appreciate the wrongfulness of his conduct and act in conformity with the law. *O'Dell*, 183 Wn.2d at 685. The sentencing court "ruled that it *could not* consider age as a mitigating circumstance" because O'Dell was a legal adult. *O'Dell*, 183 Wn.2d at 685 (emphasis added). On appeal, the Supreme Court held that the sentencing court abused its discretion because it erroneously believed that it could not consider youth as a mitigating factor and, as a result, failed to consider whether O'Dell's youth impacted his culpability. *O'Dell*, 183 Wn.2d at 696-97. The Supreme Court remanded the case for the sentencing court to resentence O'Dell using the proper factors. *O'Dell*, 183 Wn.2d at 696-97.

Here, the sentencing court did not specifically determine that it did not have discretion to impose an exceptional downward sentence. Thus, Krebs' sentence is not like that imposed in *O'Dell* and is more like that imposed in *State v. Hernandez-Hernandez,* 104 Wn. App. 263, 15 P.3d 719 (2001). In *Hernandez-Hernandez*, the defendant claimed that his counsel was deficient for not arguing for an exceptional downward sentence. *Hernandez-Hernandez*, 104 Wn. App. at 266. In that case, the defense counsel did not argue for an exceptional downward sentence, did not cite to an analogous case, and did not cite to mitigating factors at sentencing. *Hernandez-Hernandez*, 104 Wn. App. at 266. Despite that, Division Three held that defense counsel's "arguments encompassed some of the mitigating factors . . . ." *Hernandez-Hernandez*, 104 Wn. App. at 266. The *Hernandez-Hernandez* court focused on the fact that the sentencing court, even without argument, had the discretion to impose an exceptional downward sentence and thus, it held that counsel was not deficient. *Hernandez-Hernandez*, 104 Wn. App. at 266.

Similarly here, Krebs' counsel argued that the sentencing court should be lenient in its sentencing and impose the low end sentence due to Krebs' youthfulness. The sentencing court then considered his youthfulness and still decided to impose a midrange sentence. Thus, even though Krebs' counsel did not cite to *O'Dell* as authority for the sentencing court to impose an exceptional downward sentence, his counsel's arguments did encompass a mitigating factor and, even without argument, the sentencing court had the discretion to impose an exceptional downward sentence. We find that Krebs' counsel was not deficient. Therefore, we hold that this claim fails.

VII. COMMUNITY CUSTODY CONDITIONS

A. LEGAL PRINCIPLES

Krebs challenges three of the community custody conditions that the sentencing court imposed in the judgment and sentence. Specifically, he argues that the conditions that he (1) obtain a substance abuse evaluation and complete recommended treatment, (2) not possess controlled substances or drug paraphernalia without a valid prescription, and (3) submit to random urine/breath testing to monitor his alcohol/drug free status, were not crime-related. He also asks this court to clarify exactly which DOC suggested conditions the sentencing court imposed. We hold that the three challenged conditions of community custody are crime-related, and thus, the sentencing court did not err in ordering them. To the extent that Krebs asks us to clarify whether the DOC suggested conditions were imposed, we determine that the judgment and sentence did not include the DOC suggested conditions; thus, we determine that the sentencing court did not impose the DOC suggested conditions.

A defendant may assert a pre-enforcement challenge to community custody conditions for the first time on appeal if the challenge is primarily legal, does not require further factual development, and the challenged action is final.[8] *State v. Bahl*, 164 Wn.2d 739, 751, 193 P.3d 678 (2008). Trial courts may impose crime-related prohibitions while a defendant is in community custody. RCW 9.94A.505(9); RCW 9.94A.703(3)(f). A "crime-related prohibition" is defined as "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted . . . ." RCW 9.94A .030(10). "No causal link need[s to] be

---

[8] Although Krebs argues that he objected to some of the conditions, he only made a general objection to the condition that he be prohibited from drinking alcohol.

established between the condition imposed and the crime committed, so long as the condition relates to the circumstances of the crime." *State v. Williams*, 157 Wn. App. 689, 691-92, 239 P.3d 600 (2010). A condition is not crime-related if there is no evidence linking the prohibited conduct to the offense. *State v. O'Cain*, 144 Wn. App. 772, 775, 184 P.3d 1262 (2008). "We review the imposition of crime-related prohibitions for an abuse of discretion." *Williams*, 157 Wn. App. at 691.

As a general rule, the imposition of community custody conditions is within the discretion of the court and will be reversed only if manifestly unreasonable. *Bahl*, 164 Wn.2d at 753. A sentencing condition that interferes with a constitutional right must be "sensitively imposed" and "reasonably necessary to accomplish the essential needs of the State and public order." *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008).

B. Sentencing Court's Conditions of Community Custody

Here, Krebs specifically argues that the three challenged community custody conditions were not authorized because they were not crime-related. We disagree.

As to the conditions requiring that he obtain substance abuse evaluation and treatment and be subject to random urinalysis testing to monitor him, Krebs concedes that "a condition regarding alcohol consumption is clearly related to the crime." Br. of Appellant at 48. Further, the record shows that Krebs consumed alcohol and possibly used prescription drugs on the night of the incident. Thus, these two conditions are crime related.

As to the conditions related to drug paraphernalia, controlled substances, and random urinalysis, while Krebs' use of alcohol was a factor in the crime, there was also evidence presented that he may have used prescription drugs on the night of the incident. Thus, the conditions,

requiring that he not possess drug paraphernalia, that he not consume or possess any controlled substances without a valid prescription, and that he be subject to random urinalysis, were crime related. Because all of the challenged conditions of community custody were crime-related, the sentencing court did not err in ordering these conditions. Therefore, we affirm these conditions of community custody.

C. DOC SUGGESTED CONDITIONS OF COMMUNITY CUSTODY

Krebs next asks this court to clarify whether the DOC suggested conditions were imposed. We determine that the DOC suggested conditions were not ordered because they were not included in the judgment and sentence.

"To the extent its oral rulings conflict with its written order, a written order controls over any apparent inconsistency with the court's earlier oral ruling." *State v. Skuza*, 156 Wn. App. 886, 898, 235 P.3d 842 (2010). The sentencing court orally imposed the DOC suggested conditions, titled Appendix H. VRP (Sept. 9, 2016) at 46 ("I am going to impose the remaining conditions as requested by the State . . . ."). However, the written judgment and sentence do not reference "Appendix H" or incorporate it in any other way. The State argues that DOC retains its own authority to impose conditions of community custody under RCW 9.9A.704, and DOC may decide to impose the conditions set forth in Appendix H. This is true, and DOC may later impose conditions. However, here, the sentencing court did not incorporate DOC's suggested conditions in its written order. Thus, we agree with Krebs and determine that the suggested DOC conditions were not ordered by the sentencing court.

## VIII. SEALING

Krebs argues that the sentencing court erred by sealing SC's sexual assault protection order to protect the victim's identity. We disagree.

"The invited error doctrine precludes a criminal defendant from seeking appellate review of an error [he or] she helped create, even when the alleged error involves constitutional rights." *State v. Mercado*, 181 Wn. App. 624, 629-30, 326 P.3d 154 (2014). "The doctrine of invited error prohibits a party from setting up an error at trial and then complaining of it on appeal." *Mercado*, 181 Wn. App. at 630. To determine whether the invited error doctrine is applicable to a case, we may consider whether the petitioner affirmatively assented to the error, materially contributed to it, or benefited from it. *State v. Momah*, 167 Wn.2d 140, 154, 217 P.3d 321 (2009).

Here, the protection order was agreed to by both parties. Thus, Krebs cannot argue on appeal that this protection order was error, because he signed the initial order that the judge granted. Therefore, we hold that this claim fails.

## SAG

In his SAG, Krebs claims that the sentencing court erred by imposing mandatory LFO's to include a victim assessment fee, a criminal filing fee, the DNA collection fee, and restitution to SC in an amount to be determined. We disagree.

For mandatory LFOs, including victim restitution, victim assessments, DNA fees, and criminal filing fees, the legislature has expressly directed that a defendant's ability to pay should not be taken into account when the LFO's are mandatory by statute. *See State v. Mathers*, 193 Wn. App. 913, 918, 376 P.3d 1163, *review denied*, 186 Wn.2d 1015 (2016). Because all the LFO's that the sentencing court ordered are mandatory, we hold that this claim fails.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

BJORGEN, J.

PENOYAR, J. P.T.