IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>SERGIO STUARDO MONROY,<br><br>Appellant. | No. 78597-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: January 21, 2020 |

SMITH, J. — Sergio Monroy appeals his conviction for rape in the second degree of 34-year-old H.B., a resident at the apartment complex where Monroy worked as a maintenance man. He contends the State failed to prove H.B. was incapable of consent because of mental incapacity. Given overwhelming evidence of H.B.'s intoxication, sufficient evidence supports the conviction. We also reject Monroy's claims that the trial court erred by preventing him from cross-examining H.B. about her alcohol history, by admitting statements he made prior to receiving Miranda[1] warnings, and by failing to give a unanimity instruction. And we reject Monroy's argument in his statement of additional grounds that the court erred in imposing an indeterminate sentence with a maximum term of life. However, we agree that the sentencing court exceeded its

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

authority by ordering Monroy to submit to urinalysis and breath analysis monitoring as a condition of community custody. Accordingly, we affirm Monroy's conviction but remand to the trial court with instructions to strike the challenged condition.

FACTS

On the evening of January 22, 2016, H.B. invited her friend Serenity Larson to go out for a drink at the Seven Star, a bar located in the downtown area of Mercer Island. H.B. and Larson were neighbors at an apartment complex on Mercer Island, and they often went out drinking together. They arrived at the Seven Star around 6:30 or 7:00 p.m. There, a man named Terrence Stephens invited H.B. and Larson to attend a "hat party" at a nearby apartment complex. After having one drink each, H.B. and Larson went home to pick up hats, then H.B. drove them to the party.

The hat party featured a buffet table with bottles of alcohol and mixers so guests could make their own drinks. Over a period of a couple hours, H.B. poured herself "quite a few" drinks consisting of approximately 75 percent whiskey and 25 percent ginger ale. She recalled "drinking the whole time we were there." When the party started winding down, a group of people including H.B. and Larson returned to the Seven Star. H.B. testified that she was "definitely" feeling "pretty buzzed" by then but decided she was able to drive.

H.B. and Larson arrived at the Seven Star around 10:00 or 11:00 p.m. Larson testified that H.B. started drinking beer when they arrived. Larson soon noticed that H.B. was becoming "loud," "obnoxious," "a little clumsy," and "towards me kind of not nice," behaviors that to her indicated H.B. was "getting drunk." Shortly before leaving,

2

Larson ordered shots for herself and H.B. The bartender agreed to pour a shot for Larson and a watered down shot for H.B. Larson "knew [H.B.] couldn't drive," so she called an Uber and asked H.B. to leave with her. H.B. refused to leave, so Larson left alone around 12:30 a.m.

Stephens socialized with H.B. at the hat party and at the bar. Stephens testified that H.B. began to display signs of intoxication at the bar, such as "erratic communication," having "glossy eyes," and being "a little wobbly." He also recalled that H.B. continued drinking at the bar. Stephens said H.B. became flirtatious and asked him for a kiss. Eventually, H.B. became "very loud" and "confrontational with the bartender." The bartender encouraged H.B. to call a cab, but H.B. refused. Stephens asked H.B. if she needed someone to call her a cab, but H.B. got in her car and asked Stephens to come with her. Stephens declined, and H.B. got angry and drove away.

H.B. recalled drinking beer at the bar but could not say how many "[be]cause that's pretty much where I started to not really remember the night." She did not recall asking Stephens for a kiss or Larson leaving the bar. She did recall getting into her car and driving away despite Stephens telling her not to.

The next thing H.B. remembered was hearing a male voice tell her to "get out of my car and go somewhere else." She testified that she "wasn't seeing anything. It was like I was blacked out, but I could still hear things a little bit." Next, she found herself lying on her side on hard ground with her legs pushed up and a man on top of her, penetrating her. H.B. did not know the man's name but recognized him as a maintenance man at her apartment complex. She testified that she was unable to

3

speak or move while the attack was happening. She did not know where she was, but she could see a bright amber-colored fluorescent light shining through a window behind the man. Detectives later discovered such a light outside the apartment complex maintenance room a few hundred yards from where H.B. left her car.

H.B. next remembered waking up in the bedroom of her apartment, wearing pajama bottoms and the shirt she had on the night before. Her vagina and anus were sore. H.B. felt "shameful" and did not know what to do. She spent the day watching movies with Larson but did not reveal what had happened. The next day, H.B. went to the street where she usually parked her car and discovered that the front end was smashed and a tire was deflated. She then made the decision to go to Harborview Medical Center for a rape exam. There, H.B. told the medical social worker and the sexual assault nurse that she went out drinking and had only "spotty" memories or "vague recollections" of what happened when she got back to her apartment complex, including being on the ground while the maintenance man vaginally and anally penetrated her.

Mercer Island Police Detectives Joe Morris and David Canter went to H.B.'s apartment complex seeking to interview the individual H.B. identified as the maintenance man who had repaired her microwave a few days prior. The manager at the leasing office told them the person who repaired H.B.'s microwave was Monroy. The detectives asked the manager to have Monroy come to the leasing office so they could speak with him. When asked his whereabouts during the relevant time period, Monroy claimed that he got off work at 8:30 or 9:00 p.m., drove straight home, and

returned to work the next morning. He confirmed that he knew who H.B. was but denied ever having sex with her. The detectives asked Monroy for permission to collect a DNA (deoxyribonucleic acid) sample to rule him out as a suspect, and Monroy agreed to provide one.

The rape exam results showed the presence of spermatozoa on the vaginal and perineal swabs. DNA testing of these swabs showed a mixed sample, with the female profile matching H.B. and the male profile matching Monroy. The anal swabs tested positive for a protein called P30, a substance present in elevated levels in semen.

The State charged Monroy with rape in the second degree, pursuant to RCW 9A.44.050(1)(b). The first trial ended with the jury unable to reach a verdict. Upon retrial, the jury convicted Monroy as charged. The trial court imposed a midrange indeterminate standard sentence of 90 months to life. Monroy appealed.

ANALYSIS

Sufficiency of the Evidence

Monroy asserts that the State failed to present sufficient evidence that H.B. was incapable of consenting to sexual intercourse due to mental incapacity. We disagree.

A challenge to the sufficiency of the evidence admits the truth of the State's evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. State v. Townsend, 147 Wn.2d 666, 679, 57 P.3d 255 (2002). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most

strongly against the defendant." Salinas, 119 Wn.2d at 201. "Circumstantial evidence is as reliable as direct evidence." State v. Jackson, 145 Wn. App. 814, 818, 187 P.3d 321 (2008).

The State charged Monroy with violating RCW 9A.44.050(1)(b), which provides that a person is guilty of rape in the second degree "when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person [w]hen the victim is incapable of consent by reason of being . . . mentally incapacitated." "Mental incapacity" refers to a "condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause." RCW 9A.44.010(4).

Monroy asserts the evidence did not show H.B. was mentally incapacitated like the victim in State v. Al-Hamdani, 109 Wn. App. 599, 608, 36 P.3d 1103 (2001). There, the victim testified she consumed at least 10 drinks, and two experts respectively testified she had an estimated blood alcohol level of .1375 and .21 at the time of the sexual assault. Al-Hamdani, 109 Wn. App. at 609. In addition, the victim and a witness testified that she was "stumbling, vomiting, and passing in and out of consciousness" prior to the incident. Al-Hamdani, 109 Wn. App. at 609.

Here, although H.B.'s blood alcohol level at the time of the sexual assault is not known, the evidence is sufficient to support a finding that H.B. was mentally incapacitated due to intoxication. Larson and Stephens testified that H.B. exhibited visible signs of intoxication at the bar and was in no condition to drive. H.B. testified

6

that she began losing her memories of the evening while at the bar. She described being in a near blackout state while Monroy penetrated her, unable to move or speak. Moreover, she had no memory of crashing her car while driving home.

Monroy contends the evidence showed H.B. was sobering up by the time she left the Seven Star. He relies substantially on the bartender's testimony that H.B. only consumed part of a beer before it was replaced with water and that H.B. seemed less intoxicated when the bartender served her a watered down shot at the end of the night. But the bartender also testified that H.B. was "showing signs of intoxication" and indicated that H.B. should not have been driving. To the extent the bartender's testimony conflicted with that of Larson, Stephens, and H.B., we "must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). Viewing the evidence and the inferences in the light most favorable to the State, sufficient evidence supports the conviction of rape in the second degree.

### Cross-Examination

Monroy asserts that the trial court erred in denying his motion to cross-examine H.B. regarding her past history of alcohol use and about the fact that H.B. asked the nurse during her rape examination not to document her past history of alcohol use. He contends that evidence of H.B.'s past alcohol use is relevant to her tolerance to alcohol on the evening in question and that H.B.'s attempt to limit evidence documented by the nurse is relevant to her credibility.

7

"We review a cross-examination scope limitation for a manifest abuse of discretion." State v. Lile, 188 Wn.2d 766, 782, 398 P.3d 1052 (2017). An abuse of discretion exists "[w]hen a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons." State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997).

Both the federal and state constitutions protect a defendant's right to confront an adverse witness. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. "The primary and most important component is the right to conduct a meaningful cross-examination of adverse witnesses." State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002). "But this right is not absolute." Lile, 188 Wn.2d at 782. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

We apply a three-part test to determine whether a trial court violated a defendant's right to confront a witness by limiting the scope of cross-examination:

> "First, the evidence must be of at least minimal relevance. Second, if relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial. Finally, the State's interest to exclude prejudicial evidence must be balanced against the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise relevant information be withheld."

State v. Lee, 188 Wn.2d 473, 488, 396 P.3d 316 (2017) (quoting Darden, 145 Wn.2d at 622). Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. If no other evidence rule applies, relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403. Evidence that is not relevant is not admissible. ER 402.

Monroy asserts that he should have been able to cross-examine H.B. regarding her prior use of alcohol—including her previous blackouts—because it was relevant to her tolerance level for alcohol. Presumably, Monroy sought to argue that H.B.'s drinking history showed she had a high tolerance for alcohol and was therefore unlikely to have blacked out on the night in question. But Monroy offered no factual support, such as expert testimony, in support of this inference. It is not possible for the finder of fact to determine what inferences may be reasonably drawn from H.B.'s alcohol history. "[T]he existence of a fact cannot rest upon guess, speculation, or conjecture." State v. Colquitt, 133 Wn. App. 789, 796, 137 P.3d 892 (2006). The trial court properly determined that any minimal relevance was outweighed by the prejudice of introducing evidence of H.B.'s alcohol use and blackouts on occasions prior to the night in question.

Nor did the trial court abuse its discretion in preventing Monroy from cross-examining H.B. about asking the forensic nurse not to document her prior history of alcohol use in her medical records. ER 608(b) allows a witness' credibility to be

9

attacked by specific instances of conduct if the instances are probative of the witness' truthfulness or untruthfulness. There is no evidence that H.B. lied or failed to disclose any facts about her use of alcohol to the medical professionals at Harborview, to the police, or to the defense during the defense interview. H.B.'s request is not probative of her character for truthfulness or her credibility regarding the night in question.

Monroy further asserts that the trial court erred by ruling that the State did not "open the door" to allow him to cross-examine H.B. regarding her alcohol history or to cross-examine the forensic nurse regarding H.B.'s request not to document her alcohol history. We review a trial court's decision to allow cross-examination under the "open door" rule for abuse of discretion. State v. Ortega, 134 Wn. App. 617, 626, 142 P.3d 175 (2006).

Under the "open door" rule, if one party raises a material issue, the opposing party is generally permitted to "explain, clarify, or contradict the evidence." State v. Berg, 147 Wn. App. 923, 939, 198 P.3d 529 (2008). "[I]t is a sound general rule that, when a party opens up a subject of inquiry on direct or cross-examination, he contemplates that the rules will permit cross-examination or redirect examination, as the case may be, within the scope of the examination in which the subject matter was first introduced." State v. Gefeller, 76 Wn.2d 449, 455, 458 P.2d 17 (1969). The rule "is intended to preserve fairness" by preventing the introduction of one-sided testimony that the opposing party has no opportunity to rebut. State v. Avendano-Lopez, 79 Wn. App. 706, 714, 904 P.2d 324 (1995).

Here, to provide a basis for Larson's belief that H.B. was intoxicated on the night in question, the State elicited testimony from Larson that she knew how H.B. behaved when she was drunk because she had gone out drinking with H.B. "[l]ots of times." Monroy asserts that the trial court's refusal to apply the open door doctrine here permitted the State to rely on H.B.'s history of alcohol use to bolster Larson's credibility while preventing Monroy from showing how H.B.'s alcohol history undermined H.B.'s credibility. But Monroy has not shown how cross-examining H.B. regarding her alcohol history—including usage of which Larson was not a part—would explain, clarify, or contradict Larson's testimony regarding the basis for her belief that H.B. was intoxicated on the night in question or the forensic nurse's testimony that H.B. asked her not to document her alcohol history. The trial court did not err in ruling that these were separate issues and denying Monroy's request to cross-examine H.B. regarding her alcohol history.

Noncustodial Interrogation

Monroy asserts that the trial court erred in denying his CrR 3.5 motion to suppress inculpatory statements he made to Detective Morris and Detective Canter at the apartment complex because they were elicited during a pre-Miranda custodial interrogation. We disagree.

"Police must give Miranda warnings when a suspect is subject to interrogation while in the coercive environment of police custody." State v. Rosas-Miranda, 176 Wn. App. 773, 779, 309 P.3d 728 (2013). "Without Miranda warnings, a suspect's statements during custodial interrogation are presumed involuntary." State v. Heritage,

11

152 Wn.2d 210, 214, 95 P.3d 345 (2004). We determine whether an interrogation is custodial using an objective standard, which is "whether a reasonable person in the individual's position would believe he or she was in police custody to a degree associated with formal arrest." State v. Lorenz, 152 Wn.2d 22, 36-37, 93 P.3d 133 (2004). "The critical inquiry, however, is not the psychological state of the defendant, but simply whether his freedom of movement was restricted." State v. Sargent, 111 Wn.2d 641, 649, 762 P.2d 1127 (1988). We review a trial court's ruling after a CrR 3.5 suppression hearing to determine whether substantial evidence supports the trial court's findings of fact and whether those findings, in turn, support the trial court's conclusions of law. State v. Russell, 180 Wn.2d 860, 866, 330 P.3d 151 (2014).

Monroy likens his situation to that of the defendant in State v. France, 129 Wn. App. 907, 120 P.3d 654 (2005). That case is distinguishable. In France, officers detained a man suspected of violating a no-contact order and told him he was not free to leave until the matter was resolved. France, 129 Wn. App. at 908-09. Because the duration of the stop was open-ended, the court held that the questioning constituted custodial interrogation. France, 129 Wn. App. at 909-11.

Here, Detective Cantor testified that he did not expressly tell Monroy that he was not in custody. However, unlike the defendant in France, there is no indication that Monroy's freedom to leave was conditional. Both detectives specifically advised Monroy that he was not under arrest. They did not place him in handcuffs or restrict his movement. Detective Morris testified that the general tone of the conversation was "cordial" and that he did not believe Monroy was a suspect at that time. Although

12

English is not Monroy's first language, the detectives testified that they had no difficulty conversing with him in English. Monroy did not ask to leave, did not ask detectives to stop questioning him, and did not ask for an attorney at any time during the interview. Under the totality of the circumstances, the trial court did not err in concluding that Monroy was not in custody to a degree associated with formal arrest.

### Unanimity Instruction

Monroy asserts that the trial court violated his constitutional right to a unanimous jury verdict when it failed to give a unanimity instruction. He contends that such an instruction was required because the State presented evidence that he penetrated H.B. vaginally and anally but failed to specify which alleged act of penetration constituted the "sexual intercourse" element of the crime of rape in the second degree.[2]

To convict a defendant on a criminal charge, the jury must unanimously decide that the defendant committed the criminal act. State v. Coleman, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). When the State presents evidence of multiple acts that could constitute the crime charged, the jury must unanimously agree on which act constituted the crime. State v. Kitchen, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). To ensure jury unanimity, the State must either elect the act on which it relies, or the court must instruct the jury to unanimously agree on a specific criminal act. State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984). "Failure to do so can be constitutional error because of 'the possibility that some jurors may have relied on one act or incident and some

---

[2] The court instructed the jury that "sexual intercourse" is defined as "any penetration of the vagina or anus."

13

another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction.'" State v. Rodriguez, 187 Wn. App. 922, 936, 352 P.3d 200 (2015) (quoting Kitchen, 110 Wn.2d at 411).

However, the Petrich rule does not apply where the evidence shows a "continuing course of conduct." Petrich, 101 Wn.2d at 571. Where the evidence shows the defendant engaged in a series of actions intended to achieve the same objective, the acts are characterized as a continuing course of conduct rather than several distinct acts. State v. Fiallo-Lopez, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995). In contrast, evidence that the charged conduct occurred at different times and places tends to show that several distinct acts occurred. State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989). We evaluate the facts in a commonsense manner to determine whether the criminal conduct meets this standard. Petrich, 101 Wn.2d at 571.

Monroy cites State v. Bobenhouse, 166 Wn.2d 881, 214 P.3d 907 (2009), for the proposition that a unanimity instruction is required where separate acts of penetration are alleged to have occurred during the same encounter. This argument misreads Bobenhouse. The unanimity issue in Bobenhouse involved a single count of rape of a child based on allegations that between June 2002 and November 2004, Bobenhouse forced his son to regularly perform fellatio on him and that he inserted his finger in his son's anus on at least one occasion. Bobenhouse, 166 Wn.2d at 886. The court was unable to determine from the record whether the State charged Bobenhouse based on one act or multiple acts. Bobenhouse, 166 Wn.2d at 894. Therefore, the court held that "[t]o the extent this case falls under the 'multiple acts' line of cases, a Petrich instruction

14

was required." Bobenhouse, 166 Wn.2d at 894. The court concluded that the error, if any, was harmless because the evidence presented was sufficient to establish that each incident occurred. Bobenhouse, 166 Wn.2d at 894-95.

Here, in contrast, the State's evidence plainly indicated that Monroy's acts of penetration occurred within a short period of time at a single location against the same victim while she was mentally incapacitated due to intoxication. A commonsense evaluation of this evidence indicates that Monroy's acts of vaginal and anal penetration of H.B. were part of a continuing course of conduct to have sexual intercourse with H.B. while she was incapable of consent. Bobenhouse does not control.

Moreover, the record shows substantial evidence of vaginal and anal penetration. H.B. testified that Monroy penetrated her vaginally and anally and that she awoke in the morning with soreness in both areas. And the rape exam results were consistent with this testimony. Even if we were to analyze this case as a multiple acts case, failure to give a unanimity instruction would be harmless because a rational trier of fact could have found each incident proved beyond a reasonable doubt. Handran, 113 Wn.2d at 17-18 (citing Petrich, 101 Wn.2d at 573).

## Community Custody Condition

Monroy challenges a community custody condition imposed as part of his sentence.[3] He contends that special condition 12, requiring him to "[b]e available for

---

[3] Monroy did not object to this condition at sentencing, but "a defendant may challenge an erroneously imposed sentence for the first time on appeal." State v. Munoz-Rivera, 190 Wn. App. 870, 890, 361 P.3d 182 (2015).

and submit to urinalysis and/or breathanalysis upon the request of the CCO and/or the chemical dependency treatment provider," is not crime related and violates his constitutional privacy interests.

We review de novo whether the trial court had statutory authorization to impose a community custody condition. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). If the trial court acted within its statutory authority, we review its decision for abuse of discretion. State v. Johnson, 180 Wn. App. 318, 326, 327 P.3d 704 (2014).

The Sentencing Reform Act of 1981, chapter 9.94A RCW, authorizes the trial court to impose "crime-related prohibitions and affirmative conditions" as part of a sentence. RCW 9.94A.505(9). A "crime-related prohibition" is "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). Additional conditions may be imposed to monitor or ensure compliance with crime-related sentencing conditions. RCW 9.94A.030(10) ("affirmative acts necessary to monitor compliance with the order of a court may be required by [DOC]"). "Any condition imposed in excess of this statutory grant of power is void." Johnson, 180 Wn. App. at 325.

Here, the court imposed standard condition 3, requiring Monroy to refrain from possessing or consuming controlled substances except where lawfully prescribed. This condition is required unless the court waives it, regardless of the offense committed. See RCW 9.94A.703(2)(c). The court also exercised its discretion to impose special condition 11, prohibiting Monroy from consuming alcohol. See RCW 9.94A.703(3)(e); State v. Jones, 118 Wn. App. 199, 206-07, 76 P.3d 258 (2003) (Courts are authorized

16

to prohibit the consumption of alcohol regardless of whether alcohol contributed to the offense.). Monroy does not challenge the imposition of either of these conditions. He challenges only the imposition of special condition 12 to monitor his drug and alcohol use.

Monroy asserts that special condition 12 is not crime related and violates his privacy interests under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution. He relies primarily on State v. Olsen, 189 Wn.2d 118, 399 P.3d 1141 (2017). In Olsen, the Washington Supreme Court held that random urinalysis, under certain circumstances, is constitutionally permissible for probationers convicted of driving under the influence (DUI). 189 Wn.2d at 134. In so holding, the court reasoned that although random drug testing implicates a probationer's privacy interests, the intrusion is lawful where it is narrowly tailored to meet a compelling state interest. Olsen, 189 Wn.2d at 127-28. The Olsen court thus upheld the monitoring condition because random urinalysis is narrowly tailored to meet the State's compelling interest in supervising probationers convicted of DUI. 189 Wn.2d at 128.

Monroy contends that unlike the probationer in Olsen, he was not charged with a drug- or alcohol-related offense. Therefore, the court could not require him to submit to suspicionless testing simply to monitor compliance with other conditions that were not crime related. We agree.

A trial court has authority to impose monitoring conditions, such as polygraph testing, to monitor compliance with sentencing conditions. State v. Riles, 135 Wn.2d

17

326, 342-43, 957 P.2d 655 (1998), abrogated on other grounds by State v. Valencia, 169 Wn.2d 782, 239 P.3d 1059 (2010). In general, conditions that do not reasonably relate to the circumstances of the crime are unlawful unless specifically authorized by statute. Jones, 118 Wn. App. at 205. A condition is not crime related if there is no evidence linking the prohibited conduct to the offense. State v. O'Cain, 144 Wn. App. 772, 775, 184 P.3d 1262 (2008). Here, unlike the probationer in Olsen, the State did not show and the court did not find that Monroy abused drugs or alcohol or that such use contributed to the crime for which he was convicted. Because special condition 12 is not crime related, we cannot say that it was narrowly tailored or reasonably necessary to achieve a compelling state interest. Accordingly, it must be stricken.

### Statement of Additional Grounds

In a statement of additional grounds for review, Monroy asserts that the trial court committed constitutional error by sentencing him to a maximum term of life pursuant to RCW 9.94A.507. He appears to contend that this statute does not authorize life imprisonment as a maximum term of confinement and that the State failed to provide notice of intent to seek a sentence outside the standard range. Monroy is mistaken.

RCW 9.94A.507 governs the sentencing of certain nonpersistent sex offenders, including those who commit second degree rape. Offenders subject to RCW 9.94A.507 are sentenced to indeterminate sentences within the mandatory minimum sentence and the statutory maximum sentence for the crime. RCW 9.94A.507(3)(a)-(b). The maximum sentence is the statutory maximum sentence for the offense. RCW 9.94A.507(3)(b). When imposing a minimum term, the court may impose either a

18

standard range sentence or a sentence outside the standard range pursuant to RCW 9.94A.535 if the offender is eligible. RCW 9.94A.507(3)(c)(i).

Here, based on an offender score of zero, the court sentenced Monroy pursuant to RCW 9.94A.507 to an indeterminate sentence with a minimum sentence of 90 months' confinement (the middle of the standard range) and a maximum sentence of life in prison. The statutory maximum sentence for rape in the second degree, a class A felony, is life imprisonment. RCW 9A.20.021(1)(a); RCW 9A.44.050(2). Cases cited by Monroy regarding determinate sentences or indeterminate minimum sentences have no bearing in this situation. Monroy's sentence was proper.

We affirm Monroy's conviction but remand to the trial court with instructions to strike special condition 12.

WE CONCUR: